# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 97-CA-00323-SCT

*SENTINEL INDUSTRIAL CONTRACTING CORP., CENTRE INDUSTRIES CORP., SEABOARD SURETY COMPANY, ST. PAUL FIRE & MARINE INSURANCE COMPANY*

*v.*

*KIMMINS INDUSTRIAL SERVICE CORP. AND*

*KIMMINS INDUSTRIAL SERVICE CORP.*

*v.*

*EXXON CHEMICAL FERTILIZER COMPANY*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/12/1996 |
| TRIAL JUDGE: | HON. BILL JONES |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | HENRY LAIRD |
| ATTORNEYS FOR APPELLEE: | BARBARA G. WERTHER |
| | WILLIAM T. REED |
| ATTORNEYS FOR CROSS-APPELLEE: | |
| | WILLIAM V. COURTNEY |
| | S. WAYNE EASTERLING |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | DIRECT APPEAL - AFFIRMED; CROSS-APPEAL - AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 07/29/1999 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: 08/19/1999 | |

**BEFORE SULLIVAN, P.J., McRAE AND MILLS, JJ.**

**SULLIVAN, PRESIDING JUSTICE, FOR THE COURT:**

¶1. This appeal arises out of a series of contracts for the dismantlement of an ammonia plant owned by Exxon Chemical Fertilizer Company (Exxon) for shipment to and reassembly in Pakistan. Exxon's prime

contracts on the project were with Centre Industries Corporation, an affiliate company of Sentinel Industrial Contracting Corporation, (Sentinel/Centre), and Sentinel/Centre entered into subcontracts with Kimmins Industrial Service Corporation (Kimmins). After completion of the project, Kimmins sued Sentinel/Centre, Exxon, and Sentinel/Centre's bonding companies for Phase II, Seaboard Surety Company and St. Paul Fire & Marine Insurance Company (Seaboard/St. Paul), for expenses Kimmins claimed to have incurred due to extra work required on the project outside the scope of the contracts. A jury awarded Kimmins $966,375 against Sentinel/Centre and Seaboard/St. Paul, and $724,593 against Exxon. However, the trial court granted Exxon's motion for J.N.O.V. Sentinel/Centre and Seaboard/St. Paul appeal to this Court from the jury's award of damages in favor of Kimmins, and Kimmins cross-appeals from the J.N.O.V. granted to Exxon, the denial of prejudgment interest and attorneys' fees, and the refusal of its bad faith claim instructions in this case. We reverse and remand the trial court's order denying Kimmins's motion for prejudgment interest. Finding no other errors, we affirm the trial court's judgment on all remaining issues in this case.

## STATEMENT OF THE FACTS

¶2. Exxon hired Sentinel/Centre as the general contractor in a project to dismantle Exxon's ammonia refinery in Pascagoula, Mississippi, for shipment to and reassembly in Pakistan. Sentinel/Centre hired Kimmins as its prime subcontractor, and Kimmins entered into various subcontracts for completion of the project. The project was divided into two parts: Phase I involved removal of asbestos insulation from the ammonia refinery, and Phase II was the actual dismantling of the refinery. Two separate contracts between Exxon and Sentinel/Centre covered each phase. Exxon agreed to pay Sentinel/Centre $2,181,269 for Phase I and $6,567,631 for Phase II. Similarly, Sentinel/Centre entered into two contracts with Kimmins dated April 4 and 30, 1991, to cover each phase. Under the Phase I subcontract, Kimmins agreed to completely remove the asbestos material for $1,375,000, plus the cost of payment and performance bonds. Sentinel/Centre agreed to pay Kimmins $4,525,000 for the dismantlement under the Phase II subcontract, plus the cost of payment and performance bonds. The Phase I asbestos removal began in April of 1991, and the dismantling in Phase II was completed in January of 1992. At the conclusion of the project, Exxon withheld funds from Sentinel/Centre, because it was dissatisfied with the work performed by Kimmins.

¶3. On January 29, 1993, Kimmins filed suit against Exxon, Sentinel/Centre, and Seaboard/St. Paul, claiming actual damages, punitive damages, attorneys' fees, costs, and interest due because of extra work it claimed it had to perform outside the scope of its contracts with Sentinel/Centre. Kimmins sued Sentinel/Centre for breach of contract; sued Seaboard/St. Paul for failure to pay Kimmins amounts due on the payment bond; and sued Exxon for quantum meruit, unjust enrichment, tortious interference, and negligence.

¶4. Sentinel/Centre and Kimmins entered into a partial settlement agreement on February 1, 1993, under which the parties agreed that the balance due on the subcontracts totaled $960,441. Sentinel/Centre agreed to pay Kimmins $482,059 ("distribution funds"), subject to Kimmins's obtaining waivers of lien and releases of claims from each of Kimmins's subcontractors. The remaining $478,382 was to be withheld, $202,522 for funds Exxon had withheld from Sentinel/Centre for damage to parts of the ammonia plant caused during dismantling ("backcharge funds"), and $275,806 in other funds retained by Exxon ("retainage"). The parties agreed that Sentinel/Centre would pay Kimmins any amounts successfully obtained from Exxon from these withheld funds, subject to negotiations between Kimmins and Sentinel/Centre regarding the $202,522 backcharges.

¶5. Kimmins filed its amended complaint on August 31, 1993, to include additional causes of action against Sentinel/Centre for breach of the settlement agreement, unlawful conversion of funds, and breach of fiduciary duty, and against Seaboard/St. Paul for breach of their duty of good faith and for damages resulting from Sentinel/Centre's alleged breach of the settlement agreement. Kimmins claimed that Sentinel/Centre and its surety, Seaboard/St. Paul, refused to pay Kimmins after it received waivers and liens from some of its subcontractors.

¶6. On May 17, 1994, Kimmins filed its motion for partial summary judgment relating to its claims against Sentinel/Centre and Seaboard/St. Paul for breach of the February 1, 1993, settlement agreement. Circuit Court Judge Bill Jones entered an order and judgment on September 6, 1994, finding that Sentinel/Centre had breached the settlement agreement and owed Kimmins $453,945.82, or any unpaid balance on the $482,059 originally agreed upon "distribution funds." The court also found Seaboard/St. Paul jointly and severally liable for any unpaid balance pertaining to the Phase II contract.

¶7. The case proceeded to trial, and on July 26, 1996, the jury returned a verdict in favor of Kimmins against Sentinel/Centre for Phase I in the amount of $92,327, against Sentinel/Centre and Seaboard/St. Paul for Phase II in the amount of $874,048, and against Exxon in the amount of $724,593. On February 28, 1997, the trial court entered its Final Amended Judgment, in which it granted Exxon's motion for J.N.O.V. The court denied various post-trial motions filed by the other parties, including Kimmins's motion for attorneys' fees and prejudgment interest. Sentinel/Centre and Seaboard/St. Paul appealed to this Court from the lower court's judgment, assigning as error the trial court's denial of their motions for directed verdict, J.N.O.V., and new trial based upon Kimmins's failure to prove that it was entitled to extra compensation, its inadequate proof of damages, and the validity of the jury's verdict. Kimmins filed a cross-appeal to reinstate the judgment against Exxon, for assessment of attorneys' fees and prejudgment interest, and for a new trial on its bad faith claim against Seaboard/St. Paul.

## STATEMENT OF THE LAW

### CHOICE OF LAW

¶8. Although not addressed separately by the parties in their briefs, choice of law is central to the outcome of the contract, prejudgment interest, and attorneys' fees issues in this case. Out of simplification, choice of law on these issues will be briefly addressed separately at the outset. We find no need to address choice of law relating to the tort claims in this case, because the parties all agree that Mississippi law applies to those issues.

### A. Contract Issues

¶9. The prime contracts between Exxon and Sentinel/Centre contained a choice of law provision assigning Texas law to govern the interpretation of the contracts and legal relations of the parties. The subcontracts between Kimmins and Sentinel/Centre did not contain a specific choice of law provision. However, Kimmins maintains that the prime contracts were incorporated into the subcontracts, along with their choice of law provisions. Sentinel/Centre's position is that the subcontracts only referred to the prime contracts for details of Kimmins's performance and obligations, not the choice of law provision.

¶10. We agree with Sentinel/Centre. A plain reading of the subcontract language reveals that the parties' intention was to incorporate the prime contracts for purposes of detailing the plans and specifications, not to

govern choice of law in any potential contract dispute. This position is supported by the testimony of Sidney Milgrim, the president of Sentinel/Centre, Kevin O'Toole, an engineering consultant hired as an expert witness by Sentinel/Centre, and Mark DeWitt, a general manager with Kimmins involved in negotiating the subcontracts and in managing the project in this case.

¶11. Moreover, the choice of Texas law provision in the prime contracts is invalid, as conceded by Exxon in its brief, because Texas law bears no reasonable relationship to or significant contacts with the parties or the subject matter of the litigation.

> In deciding constitutional choice-of-law questions, whether under the Due Process Clause or the Full Faith and Credit Clause, this Court has traditionally examined the contacts of the State, whose law was applied, with the parties and with the occurrence or transaction giving rise to the litigation. . . . In order to ensure that the choice of law is neither arbitrary nor fundamentally unfair, . . . the Court has invalidated the choice of law of a State which has had no significant contact or significant aggregation of contacts, creating state interests, with the parties and the occurrence or transaction.

*Allstate Ins. Co. v. Hague*, 449 U.S. 302, 308 (1981) (internal citations omitted). Because Texas has little contact with or interest in the outcome of a contract dispute between Kimmins and Sentinel/Centre regarding a project in Pascagoula, Mississippi, application of Texas law in this case would be unconstitutional.

¶12. Without an effective choice of law provision, we must apply the "center of gravity" test to determine which law applies to the substantive contract issues in this case. *Sheppard Pratt Physicians, P.A. v. Sakwa*, 725 So. 2d 755, 757 (Miss. 1998) (*quoting* Restatement (Second) of Conflict of Laws § 188 (1971)). That test requires consideration of the following factors: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties." *O'Rourke v. Colonial Ins. Co.*, 624 So. 2d 84, 86 (Miss. 1993) (*quoting* Restatement (Second) of Conflict of Laws § 188 (1971)). "[F]orum law should presumptively apply unless it appears that non-forum contacts are of greater significance." *Mitchell v. Craft*, 211 So. 2d 509, 512 (Miss. 1968). In this case, no other state has greater contacts than Mississippi, the place of the performance and the location of the subject matter of the contracts. We therefore find that the law of the forum, Mississippi law, applies to the contract issues here.

### B. Attorneys' Fees & Prejudgment Interest

¶13. In Mississippi, the law of the forum applies to all procedural and remedial issues. *Ford v. State Farm Ins. Co.*, 625 So. 2d 792, 793-95 (Miss. 1993); *D'Antoni v. Teche Lines, Inc.*, 163 Miss. 668, 681, 143 So. 415, 418 (1932). That includes attorneys' fees and the determination of prejudgment interest. *Cox v. Howard, Weil, Labouisse, Friedrichs, Inc.*, 619 So. 2d 908, 914 (Miss. 1993). *See also Valley Forge Ins. Co. v. Strickland*, 620 So. 2d 535, 542 (Miss. 1993).

## APPEAL

## DID THE CIRCUIT COURT COMMIT REVERSIBLE ERROR WHEN IT FAILED TO SUSTAIN THE MOTIONS FOR DIRECTED VERDICT, NEW TRIAL, AND JUDGMENT NOTWITHSTANDING THE VERDICT?

¶14. All of the issues raised by Sentinel/Centre and Seaboard/St. Paul involve the trial court's denial of their motions for directed verdict, new trial, and judgment notwithstanding the verdict.

## Standard of Review

¶15. We reiterated our standards of review for denial of a motion for directed verdict, new trial, and J.N.O.V. in *Steele v. Inn of Vicksburg, Inc.*, 697 So. 2d 373, 376 (Miss. 1997):

> This Court's standards of review regarding a denial of a judgment notwithstanding the verdict and a peremptory instruction are the same. Our standards of review for a denial of a judgment notwithstanding the verdict and a directed verdict are also identical. Under this standard, this Court will consider the evidence in the light most favorable to the appellee, giving that party the benefit of all favorable inference that may be reasonably drawn from the evidence. If the facts so considered point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, we are required to reverse and render. On the other hand if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required. The above standards of review, however, are predicated on the fact that the trial judge applied the correct law.
>
> *Sperry-New Holland, a Div. of Sperry Corp. v. Prestage*, 617 So. 2d 248, 252 (Miss. 1993) (citations omitted).
>
> "This Court will reverse a trial judge's denial of a request for new trial only when such denial amounts to a abuse of that judge's discretion." *Shields v. Easterling*, 676 So. 2d 293, 298 (Miss. 1996) (*quoting* *Bobby Kitchens, Inc. v. Mississippi Ins. Guar. Ass'n.*, 560 So. 2d 129, 132 (Miss. 1989)).

*Steele*, 697 So. 2d at 376.

### I.

### WAS PLAINTIFF KIMMINS REQUIRED TO OBTAIN IN ADVANCE WRITTEN CHANGE ORDERS IN ORDER TO RECOVER DAMAGES, OR COULD PLAINTIFF KIMMINS BE AWARDED EXTRA COMPENSATION IF THE JURY FOUND KIMMINS HAD RECEIVED CONSTRUCTIVE CHANGE ORDERS?

¶16. Sentinel/Centre and Seaboard/St. Paul maintain that under the contracts in this case, Kimmins agreed to dismantle the ammonia plant for a lump sum, and because the ammonia plant never increased in size, Kimmins is not entitled to any additional compensation. However, as Kimmins points out in its brief, this is an oversimplification of the issue, because the project was governed by detailed plans and specifications which must be examined to reach a decision in this case.

¶17. Sentinel/Centre and Seaboard/St. Paul also assert that under the clear and unambiguous "change order" provision found in the contracts between Sentinel/Centre and Kimmins, Kimmins was required to obtain advance written approval of any extra work. Because Kimmins failed to obtain prior written approval for the extra work it claims to have performed in this case, Sentinel/Centre and Seaboard/St. Paul assert that Kimmins is not entitled to the additional compensation.

¶18. The language in each subcontract between Sentinel/Centre and Kimmins required Kimmins to provide the labor and equipment to perform the asbestos abatement and plant dismantlement as specified in the prime contracts between Exxon and Sentinel/Centre. Both of the subcontracts contained "change order" provisions in Article VIII, stating:

> No alterations except as provided for in Article VI and VII hereof shall be made in the Work covered by this Contract except upon the written order of Sentinel, and when so made, the value of the work to be added or omitted shall be stated in said order and the amount added to or deducted from the Contract price.

However, Article 7 of the prime contracts required that Kimmins proceed with work, regardless of the issuance of a change order:

> Notwithstanding that a CHANGE ORDER has not been issued, CONTRACTOR shall promptly comply with instructions, authorizations and notices given by OWNER in connection with WORK. OWNER shall issue a CHANGE ORDER with respect to such instructions, authorizations and notices if appropriate under the provisions of 7.3.

¶19. Kimmins presented evidence that it made 14 written change order requests which Sentinel/Centre refused to approve. George English, Kimmins's project manager, testified that he both sent written notices and spoke to Joseph Tomberlin, Sentinel/Centre's project manager, several times regarding work that he considered to be extra work on the project, with detailed attachments regarding the costs involved in that extra work. Edward Mackowiak, a former general manager for Kimmins, testified that on several occasions he discussed Kimmins's written change order requests with Mr. Milgrim and asked him to submit the change order requests to Exxon. George Robinson, Kimmins's expert, confirmed that Kimmins submitted written change order requests to Sentinel/Centre.

¶20. Kimmins argues that it would be unjust to allow Sentinel/Centre to require it to perform extra work but refuse to pay without a written change order, particularly when the change orders were unreasonably denied. Contrary to Sentinel/Centre and Seaboard/St. Paul's assertion that Kimmins proceeded at its own peril, Kimmins maintains that it had no choice under Article 7 of the prime contracts but to continue work without a change order upon receipt of direction to perform extra work. Mr. DeWitt testified that in his experience, such change order clauses require that the work continue, even if the parties cannot agree on whether the change order should be issued and then "argue about it later," because the important thing is completing the project. Joseph Tomberlin, Sentinel/Centre's project manager, agreed that he did not want Kimmins to stop work on the project in order to resolve a contract dispute. Kimmins also pointed out, through the testimony of Mr. DeWitt and Mr. Mackowiak, that had Kimmins stopped work, Sentinel/Centre would have default terminated Kimmins, sustained damages by having another contractor come in under Kimmins's bond, and Kimmins would have been sued for reimbursement of those costs by Sentinel/Centre and/or its surety and would have had difficulty getting bonded for future projects.

¶21. Kimmins contends that it produced sufficient evidence at trial to show that Sentinel/Centre required Kimmins to perform additional work in that it required Kimmins to complete the job in a different manner and on a different schedule than that set out under the contracts, thereby breaching the contracts. Most significantly, Kimmins presented substantial evidence that Sentinel/Centre imposed shipping dates upon Kimmins that had not been included in the original subcontracts. The subcontracts contained no interim or

milestone performance dates, only a beginning and ending date for each phase. The Phase I subcontract stated that the asbestos abatement work was to begin on April 8, 1991, and end on August 9, 1991, and the Phase II subcontract stated that the dismantlement project was to be performed between May 28, 1991, and January 15, 1992. At a May 29, 1991, meeting, Stan Thomas, a representative from Exxon, informed Kimmins's representatives that the "supercargo" (consisting of nine large pieces: an absorber, the stripper, secondary reformer, a primary reformer consisting of five pieces, and an ammonia converter) was to be shipped between September 15 and 30, 1991, contrary to Kimmins's original plans. Exxon presented testimony showing that Sentinel/Centre was aware of and agreed to this shipping schedule as early as its negotiations for the prime contracts in 1990. Kimmins's request for a change in the shipping schedule was denied. The "shipset lists," directing which equipment was to be shipped on which ships and on which dates, was prepared by Mr. Tomberlin of Sentinel/Centre. Essentially, Kimmins understood when it entered into the subcontract with Sentinel/Centre that the projected completion date for the dismantling project was January 15, 1992, but the new shipping directives required that the bulk of the plant would be shipped no later than October 1, 1991. Mr. English, Mr. Robinson, and Mr. Mackowiak testified extensively regarding the acceleration of work caused by the newly imposed shipping dates. The imposition of the interim dates required Kimmins and its subcontractors to perform the dismantling project in a different manner and at a greater cost than it had planned when making its bid for the subcontracts in order to meet the new schedule.

¶22. Kimmins also presented evidence that Sentinel/Centre required it to perform work that was excluded under its subcontracts. For example, Kimmins ended up having to relocate furnace radiant tubes from the plant that were excluded under the terms of the contract. Removal of the tubes from the warehouse where they were stored required Kimmins to take out a wall and then eventually replace that wall. Sentinel/Centre required Kimmins to remove leak valves and motors from the dismantled equipment after Kimmins thought that it had completed the required dismantling under the terms of the subcontract. Sentinel directed Kimmins to remove the control room electrical panels in one piece, rather than in multiple pieces as the subcontract allowed. Contrary to the contract terms, Kimmins had to cut the lube oil pipe apart with porter band saws and pack it for shipment rather than scrapping it. The terms of the subcontract required Kimmins to pack 15 containers, but Sentinel required it to pack 46 containers. Sentinel required Kimmins to crate pipe, while the contract specifications only required that it be bundled and strapped. Kimmins was also required to make several pipe cuts outside of the contract specifications after the piping had been dismantled. Because Kimmins understood under the subcontract terms that it would not be responsible for these items, it did not include the cost of them in its bid to Sentinel/Centre. As a result, Kimmins argued that it was due extra compensation for these costs.

¶23. Sentinel/Centre's contention is that because Kimmins failed to obtain change orders in advance of performing any additional work, Kimmins is not entitled to extra compensation. It relies on our decision in *Citizens Nat'l Bank v. L.L. Glascock, Inc.*, 243 So. 2d 67 (Miss. 1971), for the premise that under Mississippi law, change order provisions are upheld and will not be judicially altered or deleted. In *Glascock*, we held that a contractor was not entitled to additional payment on a quantum meruit basis for expenses incurred in removing the old foundations below the owner's old bank building before building the new bank, because the contract terms required prior authorization for paid extra work. *Id*. at 69-70. In so holding, the Court made the familiar statement, "Courts do not have the power to make contracts where none exist, nor to modify, add to, or subtract from the terms of one in existence." *Id*. at 70.

¶24. We cited *Glascock* in *City of Mound Bayou v. Roy Collins Constr. Co.*, 499 So. 2d 1354, 1358 (Miss. 1986), stating, "Generally, a contractor who proceeds with work without procuring a written change

order proceeds at his peril." However, we went on to point out that under Mississippi law, where the owner orders the contractor to perform extra work outside the contract, the contractor is entitled to compensation for that work, despite the fact that no change orders were issued:

We have recognized that there are circumstances in which the contractor should recover for additional work, even where the contract requires a change to be executed in writing. ***Baum & Co. v. Covert***, 62 Miss. 113 (Miss. 1884), concerned a contract to erect a large building which contained a special provision which required change orders signed by the architect and owner before the contractor began the additional work. The owners gave verbal commands to do extra work outside the contract. The owners stressed that they made no change orders in writing. The Court affirmed the jury's award to the contractor for his additional work:

This suit was not for recovery of the price of any work whatever authorized by the contract. It was expressly brought for those things which lay outside of and beyond it. The written contract, therefore, in no manner controls the rights of the parties except for showing what things were covered by the contract price. . . . Notwithstanding their stipulations to the contrary the owners must pay a reasonable value for everything furnished by their order if it be clearly established to the satisfaction of the jury that such things were ordered by them. The burden of so proving is, of course, upon the plaintiff and must be clearly established by him.

***Id***. at 120.

In the case of ***Leggett v. Vinson***, 155 Miss. 411, 422, 124 So. 472, 475 (1929), the Court said:

It is undoubtedly true that the parties to a contract may modify it, or waive their right under it, and engraft new terms upon it, and in such case the promise of one party will be sufficient consideration for the promise of another. ***Id***.

This proposition is supported in a number of jurisdictions, where:

It has been held that the contractor was entitled to recover for alterations or extras notwithstanding compliance with a stipulation requiring a written order, where it appeared that work was orally ordered, requested, directed, authorized or consented by the owner or his duly authorized agent.

2 A.L.R.3rd 620, 661 (1965).

Such a waiver is valid in the absence of such statutory authority.

***Mound Bayou***, 499 So. 2d at 1358-59. The Court allowed the recovery, finding that, "The contractors should recover in the instant case because Barrett and Mound Bayou by a persistent pattern of conduct waived the contractual provision requiring changes to be executed in writing, and moreover Barrett and Mound Bayou failed to act in good faith in performing their contractual obligations." ***Id***. at 1360.

¶25. In ***Eastline Corp. v. Marion Apartments, Ltd.***, 524 So. 2d 582 (Miss. 1988), we upheld our decision in ***Mound Bayou***, finding that the parties to a construction contract may waive the stipulation that all changes in work be approved through written change orders. ***Eastline***, 524 So. 2d at 584. We stated, "Among the acts or conduct amounting to waiver are the owner's knowledge of, agreement to, or acquiescence in such extra work, a course of dealing which repeatedly disregards such stipulation, and a

promise to pay for extra work, orally requested by the owner and performed in reliance on that promise." *Id*. (*quoting* 13 Am.Jur.2d Building and Construction Contracts § 24 (1964)). Sentinel/Centre relies heavily on the fact that in this case, it did not promise to pay Kimmins for the extra work in question. However, the language in *Eastline* fails to include the complete language from the American Jurisprudence 2d section it quotes. The first paragraph of that section states:

> Although stipulations in building or construction contracts requiring written orders or agreements for extra work or alterations are valid and binding so long as they remain in effect, it is equally well settled that they may be avoided by the parties to the contract. The courts have adopted various theories of avoidance, which may be classified as those of independent contract, modification or rescission, waiver, and estoppel.

13 Am.Jur.2d Building and Construction Contracts § 24 (1964). In *Eastline*, we found that the actions of the owner, Marion, amounted to waiver of the change order provision. Here, the actions of Sentinel/Centre amount to estoppel.

¶26. "Waiver is voluntary surrender or relinquishment of some known right, benefit or advantage; estoppel is the inhibition to assert it." Black's Law Dictionary 538 (6th ed. 1990). "Equitable estoppel arises when one party may be precluded by his act or conduct, or silence when it is his duty to speak, from asserting a right which he otherwise would have had." *Morrow v. Vinson*, 666 So. 2d 802, 803 (Miss. 1995) (*citing* Black's Law Dictionary 538 (6th ed. 1990)). "Equitable estoppel requires a representation by a party, reliance by the other party, and a change in position by the relying party." *Westbrook v. City of Jackson*, 665 So. 2d 833, 839 (Miss. 1995). Through Article 7 of the prime contracts, Sentinel/Centre represented to Kimmins that Kimmins should continue work regardless of the non-issuance of a change order. Representatives of Sentinel/Centre agreed in their testimony at trial that they did not want Kimmins to cease work on the project during disputes over change order requests. Kimmins relied on this contract provision and the threat of default termination by Sentinel/Centre in proceeding with the extra work ordered by Sentinel/Centre to Kimmins's detriment. We therefore find that Sentinel/Centre is now estopped from asserting that Kimmins may not receive compensation for the extra work due to the lack of change orders. Allowing Sentinel/Centre to maintain these inconsistent positions-requiring Kimmins to proceed with the extra work without issuance of a change order while refusing payment based on the lack of an advance written change order-would cause an injustice. We find that Kimmins was entitled to the jury award in its favor based upon Sentinel/Centre's "persistent pattern of conduct" in requiring Kimmins to perform work outside the scope of their contract and their failure to act in good faith when they refused to issue change orders. *See Griffin v. Geneva Indus., Inc.*, 193 Neb. 694, 698, 228 N.W.2d 880, 882 (1975) (Evidence that defendant knew about additional work performed by plaintiff and authorized continuation of work precluded defendant's assertion that plaintiff was not entitled to compensation due to the lack of prior written approval).

¶27. The trial judge instructed the jury that they could award Kimmins damages if they found that Sentinel/Centre's conduct amounted to a "constructive change order." Mississippi law does not recognize "constructive change orders." However, the court's instruction to the jury on the definition of "constructive change order" sufficiently complies with Mississippi law. Instruction P-20 states in pertinent part:

> A constructive change consists of two elements:
>
> 1) A change element - which calls for examination of the actual performance to see whether it went

beyond the minimum standards demanded by the subcontracts; and

2) An order element - in which a Sentinel/Centre representative, by word or deed, required Kimmins to perform work that was not a necessary part of its subcontracts.

The trial court erred in instructing the jury on "constructive change orders," a concept not recognized under Mississippi law. However, the instruction is in line with our previous decisions allowing recovery for extra compensation without regard for written change orders where the owner imposes extra-contractual work while denying change order requests. The court's instruction sufficiently informed the jury of Mississippi law in this case. Taking the evidence in the light most favorable to Kimmins, a reasonable jury could at least differ on the issue of recovery in this case. We therefore affirm the jury's award of damages against Sentinel/Centre and Seaboard/St. Paul in this case.

## II.

### DID PLAINTIFF KIMMINS PROVE ITS EXTRA COSTS WERE REASONABLE AND NECESSARY?

¶28. Sentinel/Centre and Seaboard/St. Paul claim that Kimmins failed to meet its burden of proving by a preponderance of the evidence that the extra work for which it claimed compensation was due was reasonable and necessary. While Sentinel/Centre and Seaboard/St. Paul admit that Kimmins's expert did testify that the claims were reasonable, they assert that he never stated that they were necessary to complete the work required under the contracts. Kimmins's witnesses need not have used the exact words "reasonable and necessary" in order to meet the burden of proof. As discussed more fully in Issue III below, Kimmins's burden was to prove its damages with reasonable certainty. Kimmins presented adequate evidence of its damages, and it was within the jury's purview to award damages in this case.

## III.

### DID PLAINTIFF KIMMINS PROVE ITS DAMAGES WITH REASONABLE CERTAINTY?

¶29. Sentinel/Centre and Seaboard/St. Paul contend that because Kimmins's only evidence of damages, Plaintiff's Exhibit 323, was ruled inadmissible, the testimony of Kimmins's witnesses as to the amount of damages is based upon speculation and conjecture, contrary to Mississippi law. Plaintiff's Exhibit 323 is a four-volume "Claim Documentation Book" containing details of 38 claims brought by Kimmins, separated by tabs with individual cover pages stating the amount of damages requested by Kimmins on each particular claim. Exhibit 320 is a one-page summary of the claims listing those amounts and condensing the number of claims to 33 by combining some of the claim numbers from Exhibit 323. The trial court initially sustained Sentinel/Centre's objections to the introduction of Exhibit 320 on the ground that the proper foundation had not been laid, because the person who prepared the document did not testify at trial. Throughout the trial, the attorneys continued to argue over the admissibility of the two exhibits, and the court issued multiple rulings on their admissibility. Confusion continued over what portions of Exhibit 323 were in evidence. At the close of all the evidence, but before jury deliberations, Kimmins again asked the court to admit Exhibits 320 and 323 into evidence. The trial judge agreed to allow an enlarged version of the summary (Exhibit 320A) into evidence, but only allowed the four volumes of Exhibit 323 to be admitted for purposes of appeal and not to go to the jury, because they would be duplicative, and because he doubted that the jury would read them anyway.

¶30. We find that the trial court properly admitted Exhibit 320 into evidence as a summary of the voluminous Exhibit 323. Rule 1006 of the Mississippi Rules of Evidence governs the admissibility of summaries. It states:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at a reasonable time and place. The court may order that they be produced in court.

Miss. R. Evid. 1006. We examined Rule 1006 in *Wells v. State*, 604 So. 2d 271 (Miss. 1992). There, we approved admission of a summary of business records admitted into evidence with the testimony of a witness, who stated that his secretary initially prepared the summary, which he then reviewed and edited. *Wells* 604 So. 2d at 274. We held that the summary was supported by underlying documents available to the parties and properly authenticated by the witness. *Id*. at 274-75.

¶31. Sentinel/Centre takes issue with the fact that the person who prepared Exhibit 320 was not available at trial, alleging that the proper foundation was therefore not laid for its admission into evidence. However, Mr. English testified that he did compile the documents in Exhibit 323 as business records. Exhibit 323 is the basis for Exhibit 320, and Mr. English testified that Exhibit 320 was an accurate recap of the claims in Exhibit 323. Although he admitted that to be completely certain as to its accuracy, he would have to go through the summary claim by claim, he also stated that he had previewed the summary on the Monday before he testified and had corrected any discrepancies he found at that time. In effect, Mr. English helped to prepare Exhibit 320 when he corrected it, similar to the witness in *Wells*. There is no dispute regarding the availability of Exhibit 323, the underlying documents, so the requirements of Rule 1006 were satisfied. Whatever confusion may have occurred during trial regarding the admission of Exhibits 320 and 323, we find that in the end the trial judge properly admitted Exhibit 320 in place of the voluminous Exhibit 323.

¶32. The next question is whether Kimmins's evidence proved its damages with "reasonable certainty."

> Whatever the measure of damages, they may be recovered only where and to the extent that the evidence removes their quantum from the realm of speculation and conjecture and transports it through the twilight zone and into the daylight of reasonable certainty. . . .This principle is of importance today, as we remember that a measure of speculation and conjecture attends even damage proof all would agree reasonably certain.

*Wall v. Swilley*, 562 So. 2d 1252, 1256 (Miss. 1990) (citations omitted).

> [T]he plaintiff should not be deprived of its right to recover because of its inability to prove with absolute certainty the extent of the loss or the exact amount of money unjustly and illegally collected, and the law does not require such absolute accuracy of proof. . . . The rule that damages, if uncertain, cannot be recovered, applies to their nature, and not to their extent. If the damage is certain, the fact that its extent is uncertain does not prevent a recovery.

*Billups Petroleum Co. v. Hardin's Bakeries Corp.*, 217 Miss. 24, 37, 63 So. 2d 543, 548 (1953) (citations omitted).

¶33. Exhibit 320, as supported by the detailed documents in Exhibit 323, was sufficient to prove Kimmins's damages with reasonable certainty. In addition to the summary of damages, Kimmins presented the

testimony of Mr. English regarding each of the claims outlined in Exhibit 323. Mr. English explained in detail the bases for his conclusions regarding the amount of Kimmins's damages, including time sheets for labor costs, invoices for equipment rentals and subcontractor rates, and rates for equipment usage. His testimony was supported by the conclusions of Kimmins's expert, Mr. Robinson. Taking the evidence in the light most favorable to Kimmins, the jury's verdict in this case was a reasonable conclusion based upon the evidence presented by Kimmins at trial.

## IV.

### WAS THE VERDICT INADEQUATE, BECAUSE IT WAS CONFUSING AND PREPARED BY ONLY ONE OF TWELVE JURORS?

¶34. Before deliberation, the court gave the jury an instruction (No. D-Exxon-9A) with special interrogatories pertaining to Exxon. The instruction asked the jury to either find in favor of Exxon or to find in favor of Kimmins against Exxon with a blank for the jury to enter the amount of its verdict against Exxon. Following the verdict amount were 9 "yes or no" questions asking the jury to indicate whether the verdict included amounts for specific claims brought by Kimmins. The last 2 questions asked the jury, "Does your award, if any, duplicate any award that you have previously made against" either Seaboard/St. Paul or Sentinel/Centre. When the jury returned with a verdict, they submitted a handwritten verdict instead of using the printed interrogatories. The handwritten verdict followed the language of Instruction D-Exxon-9A, but the questions regarding duplication were placed before the jury's award of damages against Exxon.

¶35. The jury verdict was read in open court, and the jury was polled without objection by any of the parties. Sometime after the parties were excused and Kimmins's counsel had left, counsel for the defendants asked Judge Jones to see the actual verdict and noticed the discrepancies between the form of the verdict given to the jury and the form of the jury's actual handwritten verdict. When this was brought to the trial judge's attention, he attempted to return the typed form to the jury to be completed, but at least some of the jurors had already left. Apparently, the jury foreman completed the form and returned it to the court for filing. The form he filled out contained the same answers as those in the handwritten jury verdict, with the only difference being the altered order of responses as described above.

¶36. The defendants argue that the jury was confused and failed to follow the court's instructions by answering the interrogatories in relation to Sentinel/Centre and Seaboard/St. Paul instead of Exxon, thereby rendering the verdict improper and invalid. They claim that since the court had discharged the jury, and they could not be sent back for further deliberations to properly complete the form, the trial judge should have ordered a new trial based upon jury confusion.

¶37. Rule 49(c) of the Mississippi Rules of Civil Procedure governs the use of a "general verdict accompanied by answers to interrogatories":

> The court, in its discretion, may submit to the jury, together with instructions for a general verdict, written interrogatories upon one or more issues of fact the decision of which is necessary to a verdict. The court shall give such explanation or instruction as may be necessary to enable the jury both to make answers and to render a general verdict. When the general verdict and the answers are harmonious, the appropriate judgment upon the verdict and answers shall be entered. When the answers are consistent with each other but one or more is inconsistent with the general verdict, judgment may be entered consistent with the answers, notwithstanding the general verdict, or the

court may return the jury for further consideration of its answers and verdict or may order a new trial. When the answers are inconsistent with each other and one or more is likewise inconsistent with the general verdict, judgment shall not be entered, but the court shall return the jury for further consideration of its answers and verdict or shall order a new trial.

Miss. R. Civ. P. 49(c). The defendants point to Rule 49 and assert that the two versions of the verdict are inconsistent. However, they fail to point out how they are inconsistent. We find that the verdict satisfies the requirements of Rule 49, because the jury's answers to the interrogatories are not inconsistent with the jury's general verdict.

¶38. More on point are Mississippi's statutes regarding defective verdicts. "If the verdict is informal or defective, the court may direct it to be reformed at the bar. . . ." Miss. Code Ann. § 11-7-159 (1972). "If the verdict is not responsive to the issue submitted to the jury, the court shall call their attention thereto and send them back for further deliberation." Miss. Code Ann. § 11-7-161 (1972). The defendants argue that the jury's handwritten verdict was defective and not responsive. Since the trial judge was unable to return it to the entire jury for further deliberation, they argue that a new trial is in order.

¶39. We disagree. The intent of Exxon's interrogatories was to prevent duplication of damage awards between Exxon and the other defendants. Jury instructions must be read as a whole when reviewing them on appeal. *Fred's Stores of Miss., Inc. v. M&H Drugs, Inc.*, 725 So. 2d 902, 917 (Miss. 1998). The jury is presumed to have followed the trial court's instructions. *Steele*, 697 So. 2d at 378. In this case, Jury Instruction P-31 informed the jury that it could not "duplicate any award concerning a claim against Exxon Chemical Fertilizer Company for Quantum Meruit with any award concerning the same claim against the other Defendants, if any." We assume that the jury followed the court's instruction, and that the handwritten jury verdict accurately reflects the intent of the jury to award damages in this case without duplication. Because the handwritten jury verdict contains a statement that the award does not duplicate any award previously made against Sentinel/Centre or Seaboard/St. Paul, we find that the verdict satisfies the intent of the interrogatories.

¶40. "No special form of verdict is required, and where there has been a substantial compliance with the requirements of the law in rendering a verdict, a judgment shall not be arrested or reversed for mere want of form therein." Miss. Code Ann. § 11-7-157 (1972).

> . . . (T)he basic test with reference to whether or not a verdict is sufficient as to form is whether or not it is an intelligent answer to the issues submitted to the jury and expressed so that the intent of the jury can be understood by the court. This well-established rule of law has long been recognized by this Court . . . .

*Harrison v. Smith*, 379 So. 2d 517, 518-19 (Miss. 1980) (*quoting* **Henson Ford, Inc. v. Crews**, 160 So. 2d 81 (Miss. 1964)). The only difference between the form of the verdict given to the foreman to fill out and the handwritten jury verdict was the order of the responses regarding duplication of awards. This change in order does not alter the meaning or intent of the verdict. The verdict was clear, responsive, and consistent with the interrogatories so as to meet the requirement for a valid jury verdict.

¶41. Further, any error in the jury's use of a handwritten verdict instead of the form provided by the trial court was harmless. The order of the jury's verdict does not affect its award of damages against Sentinel/Centre and Seaboard/St. Paul, so those defendants can show no prejudice resulting from the

format of the verdict. As discussed below, in Issue I of the Cross-Appeal, the trial court was correct in granting Exxon its motion for J.N.O.V. As a result, Exxon can show no prejudice resulting from the form of the jury verdict in this case. Any flaw in the jury's verdict amounts to harmless error.

## CROSS-APPEAL

### I.

### WHETHER THE TRIAL COURT ERRED IN GRANTING EXXON'S MOTION FOR J.N.O.V.?

### Standard of Review

¶42. In reviewing the trial court's award of a J.N.O.V. in favor of Exxon in this case, we must examine the evidence in the light most favorable to Kimmins. If substantial evidence existed to support the jury award in this case, and reasonable minds could have differed in reaching a verdict against Exxon, we must reverse the award of J.N.O.V. in this case. *See Steele*, 697 So. 2d at 376.

### I.

¶43. Kimmins argues that it presented sufficient evidence to support its claims of tortious interference with contract and quantum meruit against Exxon. As a result, Kimmins maintains that the jury verdict should be reinstated.

#### A. Tortious Interference with Contract

¶44. We outlined the elements of tortious interference with contract in *Par Indus., Inc. v. Target Container Co.*, 708 So. 2d 44 (Miss. 1998):

> When a person causes another to breach a contract with some third person, the tort is one of interference with performance of a contract. The four elements for this tort are: "(1) that the acts were intentional and willful; (2) that they were calculated to cause damage to the plaintiffs in their lawful business; (3) that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice); and (4) that actual damage and loss resulted." *Cenac v. Murry*, 609 So. 2d 1257, 1268-69 (Miss. 1992) (*citing Liston v. Home Ins. Co.*, 659 F.Supp. 276, 281 (S.D. Miss. 1986)). The plaintiff must prove that an enforceable obligation existed between the plaintiff and another party. *Merchants & Planters Bank of Raymond v. Williamson*, 691 So. 2d 398, 407 (Miss. 1997). In addition, the plaintiff must prove that the contract would have been performed but for the alleged interference. plaintiff and another party.

*Par Indus.*, 708 So. 2d at 48.

¶45. Kimmins points to specific instances in which Exxon directed Sentinel/Centre to require Kimmins to perform additional work in the form of imposed shipping dates outside the scope of the contracts, as discussed above in Issue I of the Appeal. However, we find that the trial judge was correct in granting Exxon's motion for J.N.O.V., because Kimmins's damages were caused by the breach of contract by Sentinel/Centre, and Exxon did not cause that breach without justification.

¶46. "The Supreme Court of the State of Mississippi has consistently adhered to the above principles of law pointing out that interference is not actionable unless it is 'wrongful', that is, unless it was 'without right or justifiable cause on the part of defendant'. (citations omitted)." *Vestal v. Oden*, 500 So. 2d 594, 597 (Miss. 1986) (*quoting Martin v. Texaco*, 304 F.Supp. 498 (S.D. Miss. 1969)). "The general rule in this state is that there is no tortious interference when one has a justifiable interest and reason for acting." *Id*.

¶47. Exxon had a "justifiable interest and reason for acting" in requiring Sentinel/Centre to uphold its contractual agreement with Exxon, *for which Exxon paid Sentinel/Centre*. As Exxon maintains, it had an agreement with Sentinel/Centre regarding the shipping schedule, so it had every right to insist that Sentinel/Centre meet its contractual obligation to meet that schedule. Exxon presented evidence that during its contract negotiations with Sentinel/Centre in 1990, Sentinel/Centre was advised of Exxon's expectations regarding the shipping schedule, specifically the departure of the first ship with the "supercargo" between September 15 and 30, 1991. Sentinel/Centre prepared the shipset equipment lists, not Exxon. Similarly, Sentinel/Centre, not Exxon, ordered Kimmins to perform the extra work, *for which Exxon paid Sentinel/Centre*. The trial court was correct in granting Exxon's motion for J.N.O.V. on the claim of tortious interference with contract.

### B. Quantum Meruit

¶48. Kimmins's quantum meruit claim was not supported by the record, because Kimmins had a contract with Sentinel/Centre covering the work in question. In *Redd v. L&A Contracting Co.*, 246 Miss. 548, 555, 151 So. 2d 205, 208 (1963), we stated:

> "Where there is a contract, parties may not abandon same and resort to quantum meruit." It is true, the foregoing contract was between plaintiff and defendant, but we are of the opinion that it is also true that a sub-subcontractor cannot sue on quantum meruit against a primary contractor for work done under an express contract with another person.

*Redd*, 246 Miss. at 555, 151 So. 2d at 208 (*quoting Carter et al. v. Collins*, 151 Miss. 1, 117 So. 336 (1928)). We find, in accordance with this well-reasoned conclusion in *Redd*, that Kimmins may not maintain a claim of quantum meruit against Exxon for work it performed under an express contract with Sentinel/Centre.

¶49. An award on a quantum meruit basis "would require a finding by the court that the labor was not anticipated by the contract, and also that there were no provisions of the contract by which payment could be made for unanticipated labor." *Glascock*, 243 So. 2d at 70. Kimmins cannot maintain an action against Exxon for quantum meruit under Mississippi law, because the contracts contained a specific provision regarding payment for unanticipated labor and/or materials, as discussed at length in Issue I of the Appeal, above. We therefore find that the trial court was not in error when it granted Exxon's motion for J.N.O.V. in this case.

### II.

### WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY DENYING KIMMINS'S MOTION FOR ATTORNEYS' FEES AND PREJUDGMENT INTEREST?

### Standard of Review

¶50. "'A trial court's decision on attorneys' fees is subject to the abuse of discretion standard of review.'" *Mississippi Dep't of Wildlife, Fisheries & Parks v. Mississippi Wildlife Enforcement Officers' Ass'n, Inc.*, No. 97-CA-01386-SCT, 1999 WL 47779, *11 (Miss. Feb. 4, 1999) (*quoting* *Bank of Miss. v. Southern Mem'l Park, Inc.*, 677 So. 2d 186, 191 (Miss. 1996) (*citing* **Barber v. Barber**, 234 Miss. 89, 105 So. 2d 630 (1958)). "An award of prejudgment interest is normally left to the discretion of the trial judge." *Preferred Risk Mut. Ins. Co. v. Johnson*, 730 So. 2d 574, 577 (Miss. 1998).

## II.

### A. Attorneys' Fees

¶51. "It is well settled that attorney's fees are not to be awarded unless a statute or other authority so provides." *Mississippi Dep't of Wildlife, Fisheries & Parks*, 1999 WL 47779 at *11. "In breach of contract cases, attorney fees generally are not awarded absent provision for such in the contract or a finding of conduct so outrageous as to support an award of punitive damages." *Garner v. Hickman*, No. 97-CA-01402-SCT, 1999 WL 12821, *7 (Miss. Jan. 14, 1999). As discussed below, the record did not support an instruction against Seaboard/St. Paul for punitive damages, and none are claimed against Sentinel/Centre. The contracts in this case contained no provision governing the award of attorneys' fees. Under the general law in Mississippi, Kimmins was not entitled to attorneys' fees in this case.

¶52. Kimmins argues that § 85-7-193 of the Mississippi Code (titled the Mississippi Private Works Act) allows it to recover attorneys' fees in this case against Seaboard/St. Paul. That statute allows for the recovery of attorneys' fees by a claimant on a contract surety bond where "the recovery on the bond should be inadequate to pay the full amount found due. . ." Miss. Code Ann. § 85-7-193 (1991). Since Seaboard/St. Paul's bond was sufficient to cover the full amount of judgment in this case, Kimmins is not entitled to attorneys' fees under § 85-7-193. In **Kimberly-Clark Corp. v. Alpha Bldg. Co.**, 591 F. Supp. 198 (N.D. Miss. 1984), the District Court held that, "It is well settled, however, that a claimant on a contract surety bond, such as here involved, is not entitled to recover attorney's fees unless a statute or the contract with the surety so requires." 591 F.Supp. at 204. Because Kimmins is unable to point to any applicable statute, we find that the trial court properly denied attorneys' fees in this case.

### B. Prejudgment Interest

¶53. "Mississippi has long held that the prevailing party in a breach of contract suit is entitled to have added legal interest on the sum recovered computed from the date of the breach of the contract to the date of the decree."**Stockett v. Exxon Corp.**, 312 So. 2d 709, 712 (Miss. 1975). In **Mound Bayou**, we approved the award of prejudgment interest for breach of a construction contract. **Mound Bayou**, 499 So. 2d at 1361. We have also held that prejudgment interest may be awarded even where the amount of damages is in dispute. *Preferred Risk Mut. Ins. Co. v. Johnson*, 730 So. 2d 574, 577 (Miss. 1998). The trial judge should have awarded Kimmins prejudgment interest on the damages for breach of contract in this case, calculated at 8% per annum from the date of the breach to the date of judgment. *See* Miss. Code Ann. §§ 75-17-1(1) (Supp. 1998) and 75-17-7 (1991). We therefore reverse the trial court's order denying prejudgment interest and remand this case to the Jackson County Circuit Court for a determination and award of prejudgment interest.

## III.

**WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY REFUSING TO PERMIT KIMMINS'S INSTRUCTION ON SEABOARD/ST. PAUL'S BAD FAITH FAILURE TO PAY KIMMINS'S CLAIMS TO BE PRESENTED TO THE JURY?**

**Standard of Review**

¶54. We have previously outlined our standard of review for the denial of a punitive damages instruction as follows:

> [O]ur rule is this: [t]he refusal of a timely requested and correctly phrased jury instruction on a genuine issue of material fact is proper only if the trial court--and this Court on appeal--can say, taking the evidence in the light most favorable to the party requesting the instruction, and considering all reasonable favorable inference which may be drawn from the evidence in favor of the requesting party, that no hypothetical reasonable jury could find the facts in accordance with the theory of the requested instruction.

*Willard v. Paracelsus Health Care Corp.*, 681 So. 2d 539, 543 (Miss. 1996) (*quoting* **Hill v. Dunaway**, 487 So. 2d 807, 809 (Miss. 1986) (citations omitted)).

**III.**

¶55. Kimmins contends that the trial court erred in refusing to instruct the jury on its claim against Seaboard/St. Paul for bad faith, because Kimmins presented sufficient evidence for the jury to determine that Seaboard/St. Paul acted with gross negligence or malice in failing to independently investigate and pay Kimmins's claims.

> 'Mississippi law does not favor punitive damages; they are considered an extraordinary remedy and are allowed 'with caution and within narrow limits.' . . . '[A]ny plaintiff asking for punitive damages . . . based on bad faith of an insurance company has a heavy burden.' *Life & Casualty Insurance Co. of Tennessee v. Bristow*, 529 So. 2d 620, 622 (Miss. 1988), cert. denied, 488 U.S. 1009, 109 S.Ct. 794, 102 L.Ed.2d 785 (1989). Under Mississippi law, a claim for punitive damages against an insurer will not go to the jury unless (1) there is a finding that the insurance company had no "'legitimate or arguable reason to deny payment of the claim'" and (2) the plaintiff has made a "showing of malice, gross negligence, or wanton disregard of the rights of the insured." *Id*. at 624.

*McQueen Contracting, Inc. v. Fidelity & Deposit Co. of Md.*, 871 F.2d 32, 34 (5th Cir. 1989) (wherein the Court affirmed dismissal of a punitive damages claim against a surety regarding a payment and performance bond). Where there is a legitimate dispute between the parties as to the amount owed under the contract, we have held that the denial of a punitive damages instruction was proper. *Cossitt v. Alfa Ins. Corp.*, 726 So. 2d 132, 138-39 (Miss. 1998). In the current case, the parties have consistently been involved in a legitimate dispute as to the amount of damages owed to Kimmins by Sentinel/Centre for extra work. The only period of time for which Kimmins even offers an argument that Seaboard/St. Paul acted in bad faith, was the period between the February 1, 1993, settlement agreement, and final payment under that agreement. Kimmins maintains that because Seaboard/St. Paul failed to independently investigate its claim while refusing to issue payment, the jury should have been instructed on Kimmins's bad faith claim.

¶56. Failure to perform even a minimal investigation into an insurer's claim "may give rise to punitive damages." *Lewis v. Equity Nat'l Life Ins. Co.*, 637 So. 2d 183, 187 (Miss. 1994). In this case, Michael

Fisk, a senior claims attorney for Seaboard, testified that when it became aware of the settlement agreement, its attorney was already handling the file due to pending litigation, both in this case and in a suit filed by Lifting International against Kimmins in Texas, so the attorney was the one to handle any investigation, and Mr. Fisk relied in part on the attorney's file. Mr. Fisk himself also had several discussions with representatives of Sentinel/Centre and Emcor/J.W.P., a joint venture partner with Sentinel/Centre and guarantor of the bond. Kimmins asserts this was an insufficient investigation, since they were biased parties. Nonetheless, Mr. Fisk stated that Seaboard/St. Paul determined that it should not issue payment based upon the terms of the settlement agreement, because the sum given for "distribution funds" in the settlement agreement did not differentiate between sums owed under Phase I (for which Seaboard/St. Paul was not liable) and Phase II (for which it was), and because all of the subcontractors had not been paid and signed releases per the terms of the settlement agreement. Mr. Fisk particularly noted the lack of a waiver and release from Lifting International due to the pending litigation in Texas. Kimmins was informed by Mr. Milgrim that payment was being withheld based upon the lack of waivers. Based upon these undisputed facts, we find that Seaboard/St. Paul was involved in a legitimate dispute regarding the amount it owed Kimmins, even under the settlement agreement, and that it did not act with malice or gross negligence. As a result, the trial court did not err in refusing to grant Kimmins's requested punitive damages instruction in this case.

## CONCLUSION

¶57. Under Mississippi law, Kimmins presented sufficient evidence to recover damages for extra costs under the subcontracts against Sentinel/Centre based upon Sentinel/Centre's breach of contract. Because the jury's handwritten verdict sufficiently complied with the intent of the special interrogatories requested by Exxon in this case, we find that the jury's verdict was not invalid due to want of form. We also find that Kimmins had no cause of action against Exxon in this case, its sole remedy being against Sentinel/Centre under the express terms of the contracts. With undisputed proof that there was a legitimate dispute regarding the amount owed by Seaboard/St. Paul under the settlement agreement between Kimmins and Sentinel/Centre, we hold that the trial court properly denied Kimmins's requested instruction on punitive damages. The trial judge also properly denied Kimmins an award of attorneys' fees. However, the trial judge erred in refusing an award of prejudgment interest. We therefore reverse the trial court's order denying prejudgment interest and remand this case to the Jackson County Circuit Court for a determination and award of prejudgment interest in favor of Kimmins. In all other respects, we affirm the judgment below.

¶58. **ON DIRECT APPEAL: AFFIRMED. ON CROSS-APPEAL: AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**PRATHER, C.J., PITTMAN, P.J., BANKS, McRAE, SMITH, MILLS, WALLER AND COBB, JJ., CONCUR.**