## IN THE SUPREME COURT OF MISSISSIPPI

### NO. 94-CA-01091-SCT

*MS. WILLIE LEE STEELE, INDIVIDUALLY, AND AS ADMINISTRATRIX OF THE ESTATE OF TREMAYNE STEELE, DECEASED*

*v.*

*INN OF VICKSBURG, INC. AND JOE PITZER*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/07/94 |
| TRIAL JUDGE: | HON. FRANK G. VOLLOR |
| COURT FROM WHICH APPEALED: | WARREN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | WILLIAM WALKER, JR. |
| | MARSHALL SANDERS |
| ATTORNEYS FOR APPELLEES: | R.E. PARKER, JR. |
| | SAMUEL D. HABEEB |
| NATURE OF THE CASE: | CIVIL - TORTS (OTHER THAN PERSONAL INJURY AND PROPERTY DAMAGE) |
| DISPOSITION: | AFFIRMED - 3/27/97 |
| MOTION FOR REHEARING FILED: | 4/10/97 |
| MANDATE ISSUED: | 6/26/97 |

**BEFORE SULLIVAN, P.J., PITTMAN AND BANKS, JJ.**

**SULLIVAN, PRESIDING JUSTICE, FOR THE COURT:**

¶1. This case presents the second appeal to this Court in the wrongful death action by the surviving mother of Tremayne Steele against Inn of Vicksburg, Inc. (the Inn), a franchise of Holiday Inns, Inc., and the manager of the Inn, Joe Pitzer. Thirteen-year-old Tremayne Steele died as a result of a drowning accident in the swimming pool at the Inn on Saturday, April 25, 1987. Tremayne was staying as a guest at the Inn with his baseball coach, Jay McKee, and Mr. McKee's son Patrick. Tremayne and Mr. McKee's sons had become friends through playing sports together. Mr. McKee, Tremayne, and Patrick were attending the State Soccer Championship Tournament in Vicksburg, headquartered at the Inn, in which Patrick was participating.

¶2. Holiday Inn has a rule requiring that its swimming pool water be kept clear. Mr. Pitzer testified that he had noticed on the Friday before Tremayne's death that the water in the Inn's indoor

swimming pool was cloudy due to the large number of children from the soccer tournament swimming in the pool. He had the water treated, but he knew that the water wouldn't clear up in a few hours or overnight. The Inn had a state of the art filtering system and pump which operated continuously. Edmond Gibbs was in charge of maintaining the pool and tested the water regularly to make sure that the pH, total alkalinity, calcium hardeners, and EEL reading (copper and ion levels) were all balanced. He also cleaned the pool regularly with a robot and cleaned the filter as needed. Mr. Gibbs testified that on the day that Tremayne drowned, the pool water was chemically balanced. A pool can be chemically balanced and still be cloudy, but adding chemicals to balanced water can cause skin and eye burning. The only way to clear up chemically balanced, cloudy water is to let the pool filtration system do its job. It also is ineffective to add chemicals to pool water in anticipation of a crowd, because adding chemicals when they're not needed can cause the water to become imbalanced and create cloudiness. While the Inn had the authority to close the pool because of the cloudy water on the weekend of the soccer tournament, Mr. Pitzer decided to leave it open, because he did not consider the cloudiness to be a dangerous condition. Linda Marbury testified that she and other guests noticed that the pool water was cloudy on the day that Tremayne drowned, but she had no problem with her children swimming in the cloudy water. Mr. McKee testified that he did not notice the cloudiness while he was at the pool.

¶3. Patrick's team had won enough matches to continue playing on Sunday, so Mr. McKee decided that they should spend the night in Vicksburg. He took Tremayne back to Clinton to get overnight necessities and ask for his mother's permission to return to Vicksburg for the night. On the way back to Vicksburg, Mr. McKee stopped to buy grapes, cookies, chips and sodas. He testified that he was amazed at how many grapes Tremayne ate and was unsure how many sodas Tremayne drank.

¶4. Mr. McKee testified that he asked Tremayne if he could swim and that Tremayne said he could. Ms. Steele testified that Mr. McKee was aware that Tremayne wasn't supposed to swim in deep water and that Tremayne knew not to go in the deep end of the pool. She also testified that she looked to Mr. McKee to be responsible for Tremayne and to act as Tremayne's lifeguard at the hotel swimming pool. Mr. McKee himself agreed that he was supposed to be Tremayne's lifeguard, and "didn't do a very good job apparently, unsuccessful."

¶5. When Mr. McKee and Tremayne returned to the Inn from Clinton, the kids went swimming in the indoor pool. There were signs posted at the swimming pool stating that no lifeguard was on duty and to swim at your own risk. McKee and the other parents sat around the pool watching their children, visiting, and drinking beer. There were about forty to fifty people around the pool area. Tremayne was the only black child in the pool, so he was easy to spot. However, at some point, Mr. McKee looked up and realized that Tremayne and Patrick were gone. The last time that he had seen Tremayne, he was playing "Fish Out of Water" in the shallow end of the pool, and Mr. McKee testified that he had not seen Tremayne in the deep end during the two hours that they stayed at the pool. "Fish Out of Water" is a game in which a player cannot be "tagged out" as long as he stays under water.

¶6. Mr. McKee testified that he checked the pool and didn't see either child, so he went back to their hotel room and found Patrick running in the halls. He took Patrick back to the room, then went to the game room looking for Tremayne. Ms. Steele testified that McKee told her that he was gone for thirty minutes while he put Patrick to bed. When he didn't find Tremayne in the game room, Mr.

McKee went back to the pool, and a few minutes later, some kids found Tremayne's body at the bottom of the pool. Amy Burrow administered CPR to Tremayne, but was unsuccessful. She testified that her efforts were hampered by the large amount of gastric contents that blocked Tremayne's airway.

¶7. Dr. Frank McPherson testified that Tremayne's autopsy report listed the probable cause of death as drowning. He asserted that playing "Fish Out of Water" could cause a child to pass out and breathe reflexively, taking water into the lungs. It could also cause a child to hypoventilate and breathe in water. Dr. McPherson also stated that in such a condition, the child could vomit, then breathe in the vomit, resulting in gastric contents in the lungs. He later clarified that it only takes between four and six minutes for a person to die from drowning.

¶8. Upon returning to the Inn from the hospital where Tremayne was taken, Mr. Pitzer and Mr. Goodwin, the maintenance chief, tested the water. The tests revealed that all chemical readings were still normal. However, Mr. Pitzer decided to close the pool out of respect for Tremayne and as a health precaution because of the vomit around the pool. Mr. Goodwin also treated the pool in case vomit or other unhealthy substances had gotten into the water. While he was adding chemicals to the pool, Mr. McKee and some other parents returned from the hospital. Mr. McKee testified that this was the first time that he noticed a cigar-shaped cloud in the pool, because the lights were turned on in the pool area and accentuated the cloud. Mr. McKee also testified that someone threw a penny into the pool, and they couldn't see the penny go to the bottom. However, he admitted that chemicals were already being added to the pool at this point, so the cigar-shaped cloud could have been caused by the added chemicals.

¶9. At trial, Ms. Steele's attorney alleged in closing argument that the Inn breached its duty of care toward Tremayne by failing to close the pool or warn of the dangerous condition caused by the cloudy water. He asserted that the cloudy water prevented people around the pool from seeing Tremayne while he was under water, and therefore prevented them from realizing that Tremayne was in trouble and rescuing him. The Inn's attorney argued that because it only takes between four and six minutes for a person to die from drowning that it was pure speculation to claim that resuscitation efforts would have been more successful had it not been for the cloudy water. The Inn also based its defense on the theory that Mr. McKee was solely at fault for Tremayne's drowning, because he failed to properly supervise Tremayne. The jury returned a verdict in favor of the Inn and Mr. Pitzer, and Ms. Steele appeals to this Court.

## Standard of Review

¶10.

> This Court's standards of review regarding a denial of a judgment notwithstanding the verdict and a peremptory instruction are the same. Our standards of review for a denial of a judgment notwithstanding the verdict and a directed verdict are also identical. Under this standard, this Court will consider the evidence in the light most favorable to the appellee, giving that party the benefit of all favorable inference that may be reasonably drawn from the evidence. If the facts so considered point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, we are required to reverse and render. On the other hand if there is substantial evidence in support of the verdict, that is, evidence of such quality and

weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required. The above standards of review, however, are predicated on the fact that the trial judge applied the correct law.

*Sperry-New Holland, a Div. of Sperry Corp. v. Prestage*, 617 So.2d 248, 252 (Miss. 1993) (citations omitted).

¶11. "This Court will reverse a trial judge's denial of a request for new trial only when such denial amounts to a abuse of that judge's discretion. *Shields v. Easterling*, 676 So.2d 293, 298 (Miss. 1996) (quoting *Bobby Kitchens, Inc. v. Mississippi Ins. Guar. Ass'n.*, 560 So.2d 129, 132 (Miss. 1989)).

**I.**

**WHETHER THE TRIAL COURT ERRED IN REFUSING INSTRUCTION P-1 AND IN DENYING PLAINTIFF'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT, OR IN THE ALTERNATIVE, FOR A NEW TRIAL.**

¶12. Ms. Steele first argues that the jury's verdict for the defendants was against the overwhelming weight of the evidence and that reasonable minds could not differ on the issue of the Inn's negligence in the wrongful death of Tremayne. She contends that the only reasonable conclusion which the jury could reach was that the Inn breached its duty of care to Tremayne to maintain safe premises by failing to keep the swimming pool water clear, and that this breach was at least a contributing cause of Tremayne's death. As a result, she asserts, the trial court should have either granted Instruction P-1 (directing the jury to return a verdict in favor of the plaintiff), granted her motion for judgment notwithstanding the verdict, or granted her motion for a new trial.

¶13. "When the sufficiency of the evidence is challenged on appeal, this Court properly should review the Circuit Court's ruling on the last occasion when the sufficiency of the evidence was challenged before the trial court." *Wetz v. State*, 503 So.2d 803, 808, n.3 (Miss. 1987) (citations omitted). Here, the last challenge was in Ms. Steele's motion for a new trial, at which point all evidence had obviously been presented. In order to prevail in a wrongful death action based upon a theory of negligence under Mississippi law, the plaintiff must show duty, breach of duty, causation and damages under a preponderance of the evidence standard. *Strantz ex rel. Minga v. Pinion*, 652 So.2d 738, 742 (Miss. 1995) (citations omitted).

¶14. "Beginning with the element of duty, a proprietor (or owner or operator) of a business owes a business patron or invitee the duty to maintain the premises in a reasonably secure or safe condition." *Lyle v. Mladinich*, 584 So.2d 397, 399 (Miss. 1991) (citing *Goodwin v. Derryberry Co.*, 553 So.2d 40, 43 (Miss.1989) "[A]n invitee is a person who goes upon the premises of another in answer to the express or implied invitation of the owner or occupant for their mutual advantage." *Skelton v. Twin County Rural Electric Association*, 611 So.2d 931, 936 (Miss. 1992). Tremayne, as a guest of the Inn, was a business invitee, so the Inn owed him the duty to maintain the pool in a reasonably safe condition.

¶15. Whether the Inn breached its duty of care was a question for the jury. Ms. Steele is correct in

arguing that there was ample evidence to support a jury finding that the Inn breached its duty of care by failing to keep the swimming pool water clear in violation of company policy. They might also have decided that the Inn was negligent in refusing to close the pool or post warnings upon discovering the cloudy condition of the water. However, in the alternative, the jury could have reasonably concluded that the Inn satisfied its duty to maintain safe premises by regularly cleaning the pool, continuously operating a state-of-the-art pool filtration system, and regularly checking and maintaining the chemical balance in the pool water. Based upon the testimony at trial, the jury might also have determined that the cloudy water did not create a dangerous condition. Sufficient evidence was presented at trial to support the jury finding that the Inn did not breach its duty of care.

¶16. The jury was also instructed to determine whether any alleged breach of care by the Inn was the proximate cause of Tremayne's death, and was given a proper definition of proximate cause. Again Ms. Steel is correct in asserting that the evidence would have supported a jury determination that the Inn was at least a contributing cause of Tremayne's drowning. However, substantial evidence was also presented at trial to support a jury finding that Jay McKee's insufficient supervision of Tremayne was the sole proximate cause of Tremayne's death. The jury could also have determined that based upon the short length of time required for a person to die from drowning (four to six minutes), the cloudiness in the pool water was not a contributing factor in Tremayne's death. In other words, the jury could have determined that Tremayne would have drowned even if the water had been clear.

¶17. Reasonable minds could differ on the issues of breach of duty and proximate cause in this case. Substantial evidence was presented to support the jury's verdict. As a result, the trial judge did not abuse his discretion in refusing to grant Ms. Steele a new trial. This Court should not reverse the jury's verdict based upon Ms. Steele's challenge of the sufficiency of the evidence.

## II.

### WHETHER THE TRIAL COURT ERRED IN FAILING TO GRANT PLAINTIFF'S MOTION FOR A NEW TRIAL BECAUSE OF DEFENDANT'S ATTORNEY'S REMARK TO PLAINTIFF'S FIRST WITNESS CONCERNING HIS RELIGIOUS BELIEFS IN VIOLATION OF MISS. R. EVID. 610.

¶18. During cross-examination of Ms. Steele's expert witness on economic damages, Stan Smith, defense counsel asked, "I understand, Mr. Smith, you do not have a form of religion?" Mr. Smith made no response, the judge overruled the plaintiff's objection, and he instructed the jury to disregard the question. The judge then admonished the defense attorney for his improper comment outside of the jury's presence. At the close of all evidence, the judge instructed the jury to disregard any evidence which was excluded during trial and cautioned them not to speculate about possible answers to questions which the court disallowed. Ms. Steele argues that this question violated Miss. R. Evid. 610, and that the question was so prejudicial that the jury became incapable of returning a fair verdict, and that the trial judge should have granted a new trial as a result.

¶19. Miss. R. Evid. 610 reads, "Evidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature his credibility is impaired or enhanced." The defense attorney's question was a clear violation of Rule 610, and the trial judge properly sustained Ms. Steele's objection and instructed the jury to disregard the question. This Court has previously held, "The law of error and curative instructions seems to be an analog to harmless

error. . . .Generally speaking, our law presumes that jurors follow the trial judge's instructions, as upon their oaths they are obliged to do." ***Parker v. Jones County Community Hospital***, 549 So.2d 443, 445-46 (Miss. 1989) (citations omitted) (combination of sustaining objection and instructing jury to disregard was sufficient to preclude reversal for improper question). The trial judge did everything possible to avoid any resulting prejudice from the defense attorney's improper question. Considering that Mr. Smith did not even answer the question, it is doubtful that the jury was so prejudiced as to prevent them from rendering a fair verdict. The trial judge did not abuse his discretion by refusing to grant a new trial based upon the improper question. We affirm the lower court's decision.

## CONCLUSION

¶20. Sufficient evidence was presented at trial to allow reasonable minds to differ on the issue of negligence in this case. The jury's verdict in favor of the defendants was supported by substantial evidence. As a result, the trial judge did not err in refusing to grant the plaintiff a peremptory instruction, judgment notwithstanding the verdict, or new trial based upon insufficient evidence. The trial judge similarly acted within his discretion by refusing to grant a new trial based upon the defense attorney's improper question, because the sustained objection and instruction for the jury to disregard were sufficient to cure any resulting prejudice. This Court affirms the jury's verdict in this case.

**¶21. AFFIRMED.**

**LEE, C.J., PRATHER, P.J., PITTMAN, BANKS, McRAE, ROBERTS, SMITH AND MILLS, JJ., CONCUR.**