# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2018-CA-01272-SCT

*JACK PARSONS AND PARSONS LAW FIRM*

*v.*

*VERNON WALTERS AND DONYELL WALTERS*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/28/2018 |
| TRIAL JUDGE: | HON. CHARLES W. WRIGHT, JR. |
| TRIAL COURT ATTORNEYS: | ROBIN L. ROBERTS |
| | JAMES A. WILLIAMS |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | WILLIAM T. MAY |
| ATTORNEYS FOR APPELLEES: | ROBIN L. ROBERTS |
| | CHRISTOPHER D. NOBLES |
| NATURE OF THE CASE: | CIVIL - LEGAL MALPRACTICE |
| DISPOSITION: | ON DIRECT APPEAL: AFFIRMED IN PART AND REVERSED AND REMANDED IN PART. ON CROSS-APPEAL: DISMISSED AS MOOT - 06/18/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE KITCHENS, P.J., COLEMAN AND CHAMBERLIN, JJ.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1. Vernon Walters was injured in a work-related incident in October 2006. After receiving workers' compensation benefits, he and his wife, Donyell Walters, filed a third-party claim against the company operating the train involved in the collision, Kansas City Southern Railway Company (KCSR). The Walterses hired the Parsons Law Firm to represent them in their suit, and Tadd Parsons took on the case.

¶2.    The Walterses' lawsuit against KCSR was ultimately dismissed with prejudice in September 2010 for, among other reasons, failure to prosecute, failure to comply with discovery obligations and fraud upon the court.  Tadd never told the Walterses that their case had been dismissed and led them to believe their case was ongoing.  Three years after the case had been dismissed, Tadd admitted that he fabricated a settlement offer from KCSR in the amount of $104,000 and advised the Walterses to accept the offer, which they did.  When eight months passed after Tadd informed the Walterses about the fabricated settlement, the Walterses demanded to meet with Jack Parsons, the other general partner at the Parsons Law Firm.  Jack offered the Walterses $50,000 to settle any claims they may have had against Tadd based on his conduct in representing them in the KCSR lawsuit.  The Walterses refused Jack's offer and then filed a claim against Tadd, Jack and the Parsons Law Firm, alleging claims of fraud, defamation, negligent representation, negligent and intentional infliction of emotional distress and punitive damages.

¶3.    The trial court granted partial summary judgment for the Walterses on the matter of liability, finding that Tadd and the Parsons Law Firm were liable for fraud and intentional infliction of emotional distress.  The court then held a jury trial on damages.

¶4.    The jury verdict awarded the Walterses $2,850,002 in compensatory damages, which exceeded what the Walterses had demanded in compensatory damages in their complaint and in their motion to set damages.  Accordingly, the trial court held that the jury's verdict shocked the conscience and that a remittitur should be entered to remedy the issue.  The trial

2

court remitted the damages awarded to the Walterses to $1,034,666.67 in a second amended final judgment. Parsons appealed to this Court, and the Walterses then cross-appealed.

## FACTS AND PROCEDURAL HISTORY

¶5. On October 10, 2006, Vernon Walters was injured while carrying out the duties of his job with Powell Transportation Company when the vehicle he was driving was struck by an oncoming train operated by Kansas City Southern Railway Company (KCSR). Vernon filed a workers'-compensation claim against his employer, which ultimately resulted in a settlement in Vernon's favor. As a result of the workers'-compensation case, Vernon received a lump-sum amount of $195,471.66 in workers'-compensation benefits.

¶6. In addition to the workers'-compensation claim, Vernon and his wife Donyell Walters filed a third-party negligence claim against KCSR related to the railroad-crossing incident. The settlement Vernon received in the workers'-compensation claim would act as a lien against any recovery Vernon recovered from his suit against KCSR. The Walterses hired Tadd Parsons, a general partner at the Parsons Law Firm, to represent them in their negligence claim against KCSR. The case was removed to the United States District Court for the Southern District of Mississippi on November 18, 2009. The Walterses' case against KCSR was ultimately dismissed with prejudice on September 24, 2010, following KCSR's motions to dismiss for fraud on the court and for failure to comply with discovery orders. During Vernon's deposition for the federal lawsuit, Vernon testified under oath that he had not suffered from any hearing loss before the train/truck collision, but KCSR produced evidence showing that Vernon had been deaf in his right ear since infancy. In its dismissal

3

order, the federal court stated that Vernon's false deposition testimony and Tadd's failure to comply with discovery obligations and failure to prosecute Vernon's claim warranted dismissal with prejudice.

¶7. Tadd did not inform the Walterses that their case had been dismissed with prejudice. For the next two and half years, Tadd led the Walterses to believe that their suit against KCSR was proceeding in federal court. After nearly three years of the Walterses' making repeated status inquiries to Tadd about their suit, Tadd told the Walterses that KCSR had made them a settlement offer in the amount of $88,000 on behalf of Vernon Walters and an additional $16,000 on behalf of Donyell Walters, bringing the settlement offer to a total of $104,000. Tadd then told the Walterses that if they accepted the settlement offer, they would receive $53,100 after attorneys' fees and expenses were deducted. Tadd advised the Walterses to accept the settlement offer, and they did as he advised. It is undisputed that Tadd completely fabricated this purported settlement offer.

¶8. After about eight months of inquiring about their settlement offer, the Walterses sought a meeting with Jack Parsons, Tadd's father and the other general partner of the Parsons Law Firm. During this meeting, Jack offered the Walterses $50,000 as a settlement of any claims against Tadd. Jack admitted to the Walterses that he was not sure if the workers'-compensation payment would still act as a lien on this settlement he was offering them since the money would be coming from him and/or Tadd, individually, and not from KCSR. Jack told Vernon that he did intend to inform the workers'-compensation carrier about their compromise and that the funds would be coming from a third-party source and

4

not from KCSR. The Walterses did not accept Jack's proposed settlement compromise and sought independent legal counsel.

¶9.    On October 25, 2013, the Walterses sued Tadd Parsons, Jack Parsons and the Parsons Law Firm, (collectively, Parsons) alleging claims of fraud, defamation, negligent representation, negligent and intentional infliction of emotional distress and punitive damages. In their complaint, the Walterses claimed actual damages of $105,000, which represented the amount of Tadd's fabricated settlement offer from KCSR; general damages of $145,000 for "other torts/breach of contract" and an additional $5 million in punitive damages.

¶10.    On September 8, 2015, the Walterses moved for summary judgment, seeking a judgment as a matter of law as to liability. Parsons responded to the Walterses' motion on October 29, 2015. On that same day Parsons also filed a joint motion for summary judgment as well as a separate motion for summary judgment on behalf of Jack Parsons. On December 11, 2015, in a memorandum opinion and order, the Circuit Court of Lauderdale County granted partial summary judgment for the Walterses on the issue of liability for fraud as to Tadd and the Parsons Law Firm only and for intentional infliction of emotional distress (IIED). While the court did not grant summary judgment as to Jack's individual liability for fraud, finding that the facts of that issue remained disputed, the court did hold that as a general partner in the Parsons Law Firm, Jack could be jointly and severally liable for the injury caused by his partner's wrongful conduct that was carried out in the ordinary course of business. The circuit court found that even though the Walterses had failed to present any

5

evidence of actual damages due to emotional distress, the outrageous nature of Tadd's conduct entitled the Walterses to nominal damages at a minimum. The circuit court added that the Walterses had the burden of proving additional compensatory damages for emotional distress beyond nominal damages. Other than awarding the Walterses nominal damages for emotional distress and alerting them of their burden to establish their case for compensatory damages, the circuit court left the matter of damages open, pending further proof of damages.

¶11. On June 9, 2016, the Walterses filed a motion to set damages, arguing that because it is impossible to determine what Vernon could have recovered if his case against KCSR had been successful, the amount of damages suffered as a result of Tadd's fraud and IIED could not be clearly determined either.

¶12. The Parsons responded to the Walterses' motion to set damages on August 30, 2016, and argued that they were entitled to have a jury trial on damages. The parties agreed in September 2017 to proceed with a jury trial on damages.

¶13. Before trial, Tadd Parsons filed for bankruptcy, and the circuit court stayed all causes of action against Tadd individually until the completion of his bankruptcy proceedings.

¶14. On June 19, 2018, the parties participated in a pretrial conference, and the circuit court issued a pretrial order on June 26, 2018. The pretrial order stated that the pleadings had been amended to conform to the pretrial order. Presumably because the Walterses' motion for summary judgment was granted as to the liability for fraud and IIED, all other claims of liability were withdrawn without prejudice for the purposes of this trial so that the jury could

6

focus on determining the amount of damages the Walterses should recover. The pretrial order stated that the following claims had been filed:

> Fraud, negligent and intentional infliction of emotional distress, bad faith punitive damages based on outrageous conduct, claim for attorneys' fees, costs, expenses, compensatory and consequential damages against Jack Parsons and the Parsons Law Offices (Tadd Parsons has filed bankruptcy).

The pretrial order also outlined the contested issues of fact for the jury to determine as "[a]mount of damages and attorneys' fees. The [c]ourt will determine attorneys' fees on motion following the verdict, as necessary." The contested issues of law were "[e]ntitlement to punitive damages. The [c]ourt will bifurcate on the issue of punitive damages and determine after the initial determination." The pretrial order also noted that there were no pending motions in the case as of the trial date.

¶15. On June 28, 2018, the Walterses filed a motion in limine seeking to exclude from evidence "[a]ny and all references to Vernon Walters [sic] deposition testimony" from the underlying case. The Walterses argued that Vernon's testimony from the lawsuit against KCSR should be inadmissible because "[t]he cause of action that gave rise to the deposition occurred over ten (10) years ago," because testimony regarding how Vernon was struck by the train and when and what type of hearing loss he had were irrelevant under Mississippi Rule of Evidence 401 and because Vernon's deposition testimony's probative value would be substantially outweighed by a danger of unfair prejudice, confusing the issues or misleading the jury. The motion in limine also sought to exclude documents that were produced in response to requests for production of documents in the KCSR lawsuit, arguing that the documents would be prejudicial. The circuit court granted the Walterses' motion in

7

limine. Counsel for the workers'-compensation carrier was served a copy of the pretrial order, placing it on notice of a potential lien.

¶16. The jury trial took place on August 13, 2018, and August 14, 2018, and was limited to damages. At the trial, Vernon, Donyell, Tadd and Jack testified. The jury returned a verdict for the Walterses. The jury verdict awarded Vernon Walters $2,500,000 in damages for fraud, $100,000 for emotional distress and $1 in nominal damages for IIED. It awarded Donyell Walters $150,000 in damages for fraud, $100,000 for emotional distress and $1 in nominal damages for IIED for a combined total of $2,850,002 in damages. The Walterses withdrew their claim for punitive damages during the punitive damages phase of trial.

¶17. Plaintiffs' counsel moved for an assessment of attorneys' fees, requesting that the court award attorneys' fees in the amount of $1,220,000. The trial court ultimately awarded $25,152.43 in attorneys' fees. After the attorneys' fees were determined, a final judgment was entered on August 24, 2018, and an amended final judgment was entered on August 28, 2018, to correct the omission of awards for nominal damages.

¶18. On August 31, 2018, Parsons filed a motion for judgment notwithstanding the verdict, for new trial, for relief from judgment and/or for remittitur. The Walterses responded to Parsons' motion on September 14, 2018, arguing that the jury's verdict should be affirmed. On December 12, 2018, the trial judge denied Parsons' motions for judgment notwithstanding the verdict, for new trial and for relief from judgement, but he granted their motion for remittitur and remitted the verdict to $1,134,666.67. The trial judge found that the Walterses were judicially estopped from receiving the full judgment of $2,875,154.43

8

because the jury's verdict was against the overwhelming weight of the evidence and that a remittitur of the verdict should be entered consistent with the Walterses' requests for relief made in their motion to set damages. On January 2, 2019, the trial judge entered a second amended final judgment, awarding a remitted verdict for $365,000 in damages for emotional distress, $735,000 for fraud and $34,666.67 in attorneys' fees, a total remitted verdict amount of $1,134,666.67. In the remitted verdict, the judge awarded damages to the Walterses together, as if they were one plaintiff, unlike the jury's verdict, which individually awarded Vernon and Donyell damages for fraud, emotional distress and nominal damages.

¶19. Parsons now appeals the second amended final judgment, raising two assignments of error. Parsons argues that the court erred by granting the Walterses' motion in limine and by entering a verdict that was not based on substantial evidence. Accordingly, Parsons asks that the verdict be reversed and judgment rendered in its favor or, alternatively, for a new trial. The Walterses filed a cross-appeal, claiming that the circuit court erred by remitting the jury's verdict and asking that the jury's verdict be reinstated.

## STANDARD OF REVIEW

¶20. "This Court reviews decisions regarding the admission or exclusion of evidence under an abuse-of-discretion standard." *Ill. Cent. R.R. Co. v. Brent*, 133 So. 3d 760, 776 (Miss. 2013) (citing *Yoste v. Wal-Mart Stores, Inc.*, 822 So. 2d 935, 936 (Miss. 2002)).

¶21. "The standard of review for trial court decisions regarding a remittitur is the abuse of discretion standard." *U.S. Fid. and Guar. Co. of Miss. v. Martin*, 998 So. 2d 956, 969 (Miss. 2008). This Court "has the responsibility to see that such judicial discretion is

9

exercised soundly and, if not, to reverse." *Id.* (internal quotation marks omitted) (quoting *Holmes Cty. Bank & Tr. Co. v. Staple Cotton Coop. Assoc.*, 495 So. 2d 447, 451 (Miss. 1986)). The Court will not interfere with a jury's award of damages unless there is insufficient proof to support the award. *Cmty. Bank, Ellisville, Miss. v. Courtney*, 884 So. 2d 767, 776 (Miss. 2004) (citing *Entergy Miss., Inc. v. Bolden*, 854 So. 2d 1051, 1058 (Miss. 2003)).

¶22. "The standard of review on a motion for a new trial is abuse of discretion." *Johnson v. St. Dominics-Jackson Mem'l Hosp.*, 967 So. 2d 20, 23 (Miss. 2007) (citing *Steele v. Inn of Vicksburg, Inc.*, 697 So. 2d 373, 376 (Miss. 1997)). In a motion for a new trial, the Court reviews the weight of the evidence rather than the legal sufficiency of the evidence. *Id.* It is well established law that

> "When reviewing a denial of a motion for a new trial based on objection to the weight of the evidence, [the Court] will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice."

*Id.* (quoting *Bush v. State*, 895 So. 2d 836, 844 (Miss. 2005), *abrogated on other grounds by Little v. State*, 233 So. 3d 288, 291 (Miss. 2017)). The evidence should be reviewed in the light most favorable to the verdict. *Id.* (citing *Herring v. State*, 691 So. 2d 948, 957 (Miss. 1997)). The verdict should not be set aside unless the Court finds that it is not supported by the substantial weight of the evidence. *Id.* (quoting *Lift-All Co. v. Warner*, 943 So. 2d 12, 15 (Miss. 2006)). "This Court shall reverse a trial judge's denial of a request for new trial only when such denial amounts to [an] abuse of that judge's discretion." *Id.* (internal quotation marks omitted) (quoting *Steele*, 697 So. 2d at 376).

10

¶23.    On direct appeal, Parsons argues that the trial court erred by granting the Walterses' motion in limine excluding Vernon's deposition testimony from the underlying KCSR lawsuit and by entering a judgment against Parsons that was not based on sufficient evidence. Parsons asks that the verdict against it be reversed and judgment rendered in their favor, or alternatively, for a new trial.  On cross-appeal, the Walterses argue that the trial court erred by remitting the damages awarded to them by the jury's verdict and request that this Court reinstate the jury's verdict.

## I.    Whether the trial court erred by granting the motion in limine.

¶24.    On direct appeal, Parsons argues that the circuit court erred by granting the Walterses' motion in limine, which excluded any evidence pertaining to Vernon Walters's deposition testimony taken for the purposes of the KCSR lawsuit.  Parsons argues that the exclusion of such evidence deprived Parsons of an opportunity to develop before the jury the lack of value and potential for the Walterses' suit against KCSR.  The Walterses argue here, as they did in their motion in limine, that the evidence they sought to exclude should not have been admitted because it was not relevant to the case before the court under Mississippi Rule of Evidence 401 and because the evidence's probative value would have been greatly outweighed by its prejudicial effect.

¶25.    "[I]f any evidence has probative value at all, the rule favors its admission." *APAC–Miss., Inc. v. Goodman*, 803 So. 2d 1177, 1184 (Miss. 2002) (internal quotation marks omitted) (quoting Miss. R. Evid. 401).

11

¶26. Parsons argues that the jury should have been allowed to hear the excluded evidence regarding the value of the Walterses' underlying lawsuit against KCSR. We agree with the Walterses that the evidence was not relevant to the issues before the jury at trial.

¶27. At trial, counsel for the Walterses stated several times that the Walterses were not seeking damages for Tadd's allowing their case against KCSR to be dismissed. The Walterses' counselor went on to state that the Walterses filed this case against Tadd, Jack and the Parsons Law Firm based on the damages they incurred from Tadd's lying to them.

¶28. The jury in this case had the task of determining the amount of damages the Walterses experienced due to fraud and IIED by Tadd Parsons and the Parsons Law Firm. The damages that the Walterses experienced due to Tadd's fraud and IIED had nothing to do with the value of the underlying case. The relevant damages at issue were incurred from Tadd's false settlement offer and the emotional distress the Walterses endured due to Tadd's wrongful conduct. We affirm the trial court's ruling on this issue.

## II. Whether the verdict is supported by substantial evidence.

¶29. On direct appeal, Parsons argues that the evidence presented at trial was not sufficient to support the verdict returned by the jury nor was it sufficient to support the verdict as remitted by the trial judge in the second amended final judgment. Parsons argues that the verdict was based on impermissible speculation rather than substantial evidence. The Walterses counter Parsons' arguments, claiming that the testimonies Vernon, Donyell and Tadd made at trial are "damning and disturbing" and that given their testimonies, it cannot be said that the jury award is against the overwhelming weight of the evidence.

12

¶30.    We find that the Walterses have not presented sufficient evidence to support the jury's damages award or the trial court's remittitur.

¶31.    "A fraud action permits the recovery of damages attributable to reliance upon an intentional misrepresentation." *Cook v. Children's Med. Group, P.A.*, 756 So. 2d 734, 741 (Miss. 1999).  "Recovery for emotional distress and mental anguish, as well as punitive damages, is allowed for fraud cases."  *Id.* at 740 (citing *T.G. Blackwell Chevrolet Co. v. Eshee*, 261 So. 2d 481, 485 (Miss. 1972)).  Damages for emotional distress alleged in connection with intentional tortious conduct may be recovered, even when the plaintiff has experienced no physical injury.  *Cmty. Bank, Ellisville, Miss. v. Courtney*, 884 So. 2d 767, 775 (Miss. 2004) (quoting *Morrison v. Means*, 680 So. 2d 803, 805 (Miss. 1996), *abrogated on other grounds by Adams v. U.S. Homecrafters, Inc.*, 744 So. 2d 736 (Miss. 1999)).  The standard considers whether the "the defendant's behavior is malicious, intentional, willful, wanton, grossly careless, indifferent or reckless."  *Wilson v. General Motors Acceptance Corp.*, 883 So. 2d 56, 65 (Miss. 2004) (quoting *Leaf River Forest Prods., Inc. v. Ferguson*, 662 So. 2d 648, 659 (Miss. 1995), *abrogated on other grounds by Adams*, 744 So. 2d at 742).  "Still, even such a demonstration does not, without more, create a positive showing of compensatory damages for emotional distress. A plaintiff who has been intentionally wronged without demonstrable injury is to be awarded nominal damages."  *Sumler v. E. Ford, Inc.*, 915 So. 2d 1081, 1089 (Miss. Ct. App. 2005) (citing *Whitten v. Cox*, 799 So. 2d 1, 10 (Miss. 2000)).  "[T]he plaintiffs still bear the burden of demonstrating the need for compensatory damages beyond nominal damages[.]"  *Whitten*, 799 So. 2d at 10.  To be

13

compensable, damages from emotional distress must amount to more than mere discomforts. *Id.* "[E]xpert testimony showing actual harm or proof of a physical or mental injury is not always required." *Gamble ex rel. Gamble v. Dollar Gen. Corp.*, 852 So. 2d 5, 11 (Miss. 2003). When claims of emotional distress involve "only sleeplessness, mental anguish, and humiliation, compensatory damages can be awarded based 'on the nature of the incident from which the damages flow.'" *Id.* (quoting *Whitten*, 799 So. 2d at 10–11).

¶32. "Compensatory damages are such damages 'as will compensate the injured party for the injury sustained, and nothing more; such as will simply make good or replace the loss caused by the wrong or injury.'" *Richardson v. Canton Farm Equip., Inc.*, 608 So. 2d 1240, 1250 (Miss. 1992) (quoting Compensatory damages, *Black's Law Dictionary* (5th ed. 1979)). Compensatory damages should not be awarded as a means of punishment or deterrent for a defendant's reprehensible behavior, for it is the role of punitive damages to act as a "means by which the public interest is served by sanctioning a party for particularly offensive conduct both as punishment to the offending party and as an object lesson to others to avoid similar conduct in the future." *Brown v. N. Jackson Nissan, Inc.*, 856 So. 2d 692, 697 (Miss. Ct. App. 2003) (citing *Am. Life Ins. Co. v. Hollins*, 830 So. 2d 1230, 1243 (Miss. 2002), *overruled on other grounds by Mladineo v. Schmidt*, 52 So. 3d 1154 (Miss. 2010)).

¶33. When the facts and award in this case are compared to awards this Court has previously upheld for emotional-distress damages stemming from injuries sustained from a defendant's intentionally tortious conduct, it is abundantly clear that the award here was not based on sufficient evidence.

14

¶34. In *Gamble*, this Court upheld a $75,000 jury verdict awarding actual damages for assault and the emotional distress the assaulted caused, when the plaintiff had demanded actual and punitive damages in excess of $2,500. *Gamble*, 852 So. 2d at 8. The plaintiff in that case was publicly accused of shoplifting and after asking the plaintiff what she had in her pants, the store employee grabbed the plaintiff by the panties from the back of her pants and pulled on them. *Id.* at 9. The evidence presented regarding the plaintiff's emotional distress included the testimony of the officers to whom the plaintiff reported the incident that the plaintiff was extremely upset and crying when recounting the incident to the police; the plaintiff's own testimony that the incident had made her feel assaulted and humiliated after baselessly having her underwear checked for stolen merchandise in public, had upset her emotionally and had affected her grades and had caused her to suffer from insomnia about four nights a week; and testimony from the plaintiff's parents and friends corroborating her emotional-distress claim. *Id.*

¶35. Unlike the evidence presented in *Gamble*, here, the Walterses have failed to present evidence of any physical manifestations, beyond Donyell's testimony that she had suffered some sleepless nights due to stress stemming from Vernon's being injured and the usual stress that having a pending lawsuit would induce, of the emotional distress they have suffered as a result of Tadd's fraud and IIED. The plaintiff in *Gamble* also called several witnesses who corroborated her testimony, including her parents, friends and the officer to whom she reported the incident. Here, the Walterses called no witnesses other than each other to corroborate their testimonies about the emotional distress they had suffered.

15

¶36.    In *Whitten*, this Court held that in light of the evidence presented, the jury reasonably returned a verdict awarding one plaintiff, Cox, $50,000 in compensatory damages and $30,000 to the two other plaintiffs, Logan and Spinosa, for their claims of emotional distress related to their claims for assault, battery and false imprisonment. *Whitten*, 799 So. 2d at 13. There, Cox was ordered to get out of his truck, had his truck shot at while he was driving it, was threatened physically, had a gun held to his head, was handcuffed, was threatened to be thrown into a bayou while handcuffed, had a tire on his truck shot out, had his cap pulled down over his face, was made to lie face down on the ground and to kneel on the ground while men with loaded assault rifles stood around and was illegally detained. *Id.* at 12. Cox testified that the incident placed him in an immediate state of shock, changed him as a person, made him feel demeaned and caused him to suffer marital problems; he stated that the incident played a large part in his divorce from his wife. *Id.* Cox's brother also testified the emotional distress caused Cox to lose thirty pounds. *Id.* at 11–12.

¶37.    Throughout the incident, the other two plaintiffs, Logan and Spinosa, were passengers in a truck being shot at; had a cocked pistol waved around in their faces, pointed directly at them and held about twelve inches from their heads; were threatened with physical violence; were ordered out of the car; were ordered to the ground and kept down on the ground; were cursed at incessantly; were surrounded by men armed with loaded assault rifles; and were illegally detained. *Id.* at 12–13. Logan testified that he truly felt that the defendant might have shot Cox and that the incident stuck in his mind. *Id.* at 12. Logan further testified that the incident made him suffer from fear to leave his wife and children alone and from

16

nervousness and worry, that the incident made him unable to concentrate at work and that the incident made him short-tempered with his wife and children. *Id.* Logan's wife testified that Logan was nervous, that Logan had difficulty sleeping and that his work had suffered. Logan's father testified that the emotional distress from the incident had affected Logan's work and had made him nervous and upset all the time and that Logan had not been the same since the incident. *Id.* The other plaintiff, Spinosa, testified that since the incident, because of the defendant's conduct, he felt devastated, like an old dog that had been kicked around. *Id.* at 13. Spinosa testified that ever since the incident, every time he saw the defendant, he would become fearful; the emotional distress from the incident troubled him enough to move his family away from the town where they were living, where the incident occurred and where the defendant lives. *Id.*

¶38. The plaintiffs in *Whitten* only recovered amounts of $50,000 and $30,000 for emotional distress after suffering from devastating, lingering and life-altering manifestations of emotional distress. *Id.* Here, the Walterses' emotional distress manifested merely as feelings of anger, deceit, betrayal or just simply feeling let down.

¶39. In *Morrison*, this Court stated that even if the facts of the case were different so that the defendant's conduct had risen to the level of malicious, intentional, willful, wanton, grossly careless, indifferent or reckless, the plaintiff, Means, still could not recover on a claim of mental anguish resulting from the defendant's conduct for lack of injury. *Morrison*, 680 So. 2d at 806–07, *abrogated on other grounds by **Adams***, 744 So. 2d at 742. Means testified that he had endured many sleepless nights because he felt that Morrison, the

17

defendant, had wronged him and had cheated him out of his own money that he needed to support his family. *Id.* at 807. Means also testified that Morrison's alleged conduct "caused him the stress and anxiety of trying to determine how he could make ends meet without the" money he believed Morrison owed him. *Id.* at 806. Means put the amount at issue in the case into perspective by testifying that because he was just a young farmer, the money he believed Morrison owed him, $1,456.80, amounted to a significant part of his family's income. *Id.* The Court stated that the evidence Means presented in that case would not be sufficient to support a verdict award of $3,543.20 in compensatory damages for emotional distress. *Id.* at 807.

¶40. The claims of emotional distress in *Morrison* echo several of the Walterses' claims here. Vernon testified that he and Donyell were trying to figure out how they were going to afford to pay for everything if Vernon could not go back to work, how they were going to be able to keep everything that he had worked for and how they were going to survive.

¶41. Similar to the testimony in *Morrison*, the Walterses' testimony also only contained two sentences about sleepless nights. Donyell testified that she had experienced sleepless nights due to the fact that she was trying to take care of her injured husband and trying to work. When Vernon was asked on direct examination if he had problems sleeping, he replied with a one word answer, "Yes." He did not elaborate as to how frequently he experienced a sleepless night or when these sleepless nights began or what might have been causing them.

18

¶42. The facts and procedural history of *Stewart v. Gulf Guaranty Life Insurance Co.*, 846 So. 2d 192 (Miss. 2002), are quite similar to the facts here. In *Stewart*, the jury returned a verdict awarding damages of $3,500 for breach of contract, $500,000 for emotional distress and $500,000 in punitive damages, and the trial court subsequently ordered a remittitur of the damages for emotional distress to $50,000. *Id.* at 198. The plaintiff, Stewart, appealed, requesting that the jury verdict be reinstated. *Id.* Stewart testified that the economic strain caused by the defendant's denial of his claim forced his family to file for food stamps, which was an embarrassment for Stewart. *Id.* at 199. Stewart further testified that the emotional distress stemming from the denial of his claim caused him to experience weight loss, trouble sleeping and eating, extreme anxiety and crying spells. *Id.* Stewart's wife's testimony corroborated Stewart's, and both testified that Stewart had never had such problems before his claim was denied by the defendant. *Id.* Dr. Mark Allen, who began treating Stewart about the month after his claim was denied, "testified that Stewart was severely depressed, extremely anxious, and suffered from stress-induced obsessive compulsive disorder." *Id.* at 199–200. Dr. Allen also testified that he had been prescribing antidepressants for Stewart for more than seventeen months. *Id.* at 200. This Court stated that in light of the evidence presented, "[c]learly, Stewart demonstrated compensable damages for mental anguish and emotional distress[]" resulting from the denial of his insurance claim. *Id.* Thus, this Court found that Stewart had presented sufficient evidence to support the jury's award of $500,000 in damages for emotional distress. *Id.*

¶43. Here, Vernon testified that he was also having problems with depression and dealing with everyday life because his brain was still bothering him. Vernon had suffered from bleeding on the brain as a result of the collision with the train. The Walterses presented no medical expert testimony to corroborate or support Vernon's claim of depression or for any other emotional distress they had suffered. Expert testimony is not always required before a plaintiff can recover damages for depression resulting from emotional distress. *Gamble*, 852 So. 2d at 11. But, here, because the evidence of depression is based solely on the plaintiff's own speculation, assertion or self-diagnosis of depression, such a large recovery is not warranted.

¶44. The Walterses' remaining claims of emotional distress resulting from Tadd's fraud are scant and do not carry much weight.

¶45. Donyell testified that she had suffered from stress, but she also testified that the cause of that stress preexisted her and her husband's retaining Tadd Parsons. Donyell testified that the stress she and Vernon experienced did not start as a result of settlement-offer meeting but that she was already stressed after Vernon's accident because her husband had been injured. Donyell testified that she felt more stressed and more frustrated as time went on though because she was not receiving feedback from Tadd as to what was happening in her husband's case. Donyell testified that her stress level remained the same when she and Vernon went to retain a new attorney the day after their meeting with Jack but that she was getting more angry. Donyell similarly testified that she suffered from worrying about her husband because he had been injured in an accident.

20

¶46. The emotion the Walterses seem to have experienced the most is anger. Donyell testified that after she learned that the settlement offer was not real, she "was angry and hurt, felt like [she] had been screwed over and [her] husband had been screwed, after going through an accident. And it is hard. Makes you not want to trust an attorney. You don't know who you can trust if you can trust them. So angry." She testified that Vernon was very angry and hurt as well but that "he keeps it more bottled up inside." When Vernon was asked how he felt when he found out that Tadd had lied to him, Vernon responded, "Oh, I was PO'd big time. I mean, I could have bit nails. I mean, I was hot. If I had – that day I found him – I mean that day I found out the information . . . ." When asked how he felt when he found out that his trust in Tadd had been misplaced, Vernon answered that he could not put it in words but that he was just hurt.

¶47. The above-referenced cases provide examples of award amounts for compensatory damages that this Court has previously deemed appropriate and acceptable and those that this Court has not. We do not seek to limit the jury's power or ability to award whatever amount it finds appropriate for compensatory damages in future cases in which the evidence is sufficient to support the award. But, here, the evidence presented simply does not support a verdict of more than $1 million. It appears clear that the initial jury verdict was punitive in nature. For reasons unknown to this Court, however, the Walterses withdrew their punitive-damages claim.

¶48. After reviewing the evidence presented at trial, it is clear that the compensatory damages awarded to the Walterses were excessive and could not be supported by the

21

presented evidence. This Court believes that the egregious, outrageous and obviously intentional nature of Tadd's conduct may have influenced the trial court to award compensatory damages that were penal in nature. But compensatory damages should be awarded only up to an amount that will compensate the plaintiffs for the injuries they sustained and should not be increased based on the nature of a defendant's conduct. Punitive damages, rather, are the means by which a defendant may be punished for the egregious or outrageous nature of his conduct and deterred from conducting himself in a similar manner in the future. Here, the Walterses withdrew their claim for punitive damages after the jury returned an excessive verdict on compensatory damages in their favor. Whether the Walterses' claim for punitive damages may be revived is a question for the trial court to answer on remand in accordance with applicable law.

## CONCLUSION

¶49. After reviewing the record, we find that the trial court did not abuse its discretion by excluding irrelevant evidence about the underlying KCSR lawsuit because the value of the lawsuit has no bearing on the damages the Walterses sustained due to Tadd Parsons's and the Parsons Law Firm's fraud and IIED.

¶50. We further find that the Walterses have failed to present evidence sufficient to support the judge's remitted verdict award of $1,134,666.67 in compensatory damages for fraud and

22

emotional distress, and we reverse the judgment of the trial court and remand the case for a new trial on damages.[1]

¶51. Because we find that the remitted verdict's award of damages is excessive and is not supported by substantial evidence, the Walterses' request to reinstate the jury's verdict that was raised on cross-appeal is moot.

¶52. **ON DIRECT APPEAL: AFFIRMED IN PART AND REVERSED AND REMANDED IN PART. ON CROSS-APPEAL: DISMISSED AS MOOT.**

**KITCHENS AND KING, P.JJ., COLEMAN, BEAM, ISHEE AND GRIFFIS, JJ., CONCUR. RANDOLPH, C.J., AND MAXWELL, J., NOT PARTICIPATING.**

---

[1]Mississippi Rule of Civil Procedure 54(d) states in pertinent part that a "final judgment shall not be entered for a monetary amount greater than that demanded in the pleadings or amended pleadings." Miss. R. Civ. P. 54(d). Whether the Walterses' pleadings may be amended according to Mississippi Rule of Civil Procedure 15(b) and applicable case law so that the Walterses may receive an award for compensatory damages exceeding the $250,000 they demanded in their complaint is a question for the trial court to determine on remand.